**James W. GREATHOUSE, Appellant,**

v.

**The GLIDDEN COMPANY, Appellee.**

**No. 14–99–00447–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

Jan. 11, 2001.

Dissenting Opinion on Overruling
of Rehearing March 29, 2001.

Lionel M. Schooler, Houston, for appellants.

Jeffrey Parsons, David A. Clark, Houston, for appellees.

Panel consists of Justice ANDERSON, FROST and MAURICE E. AMIDEI.*

## OPINION

FROST, Justice.

James W. Greathouse appeals the trial court's entry of a take-nothing judgment on his claim against The Glidden Company for severance benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1002, et seq. ("ERISA") (1999 & Supp.2000) and his common law claims for breach of contract, fraud, and fraud in the inducement. Greathouse also appeals the trial court's judgment awarding attorney's fees to Glidden on its suit to collect on a promissory note. We affirm.

### I. OVERVIEW

#### A. FACTUAL BACKGROUND

In 1969, Greathouse went to work for Devoe Paint Company, a subsidiary of Grow Group, Inc. Pursuant to a change in control agreement with Grow Group, Greathouse was to have received severance pay if he left his employment voluntarily. This severance payment was to have been calculated at two weeks' pay for every year of service, dating back to 1969, when his employment with Devoe commenced, plus an additional eight weeks' pay.

In 1995, Glidden purchased Grow Group. In September of that year, Greathouse met with Daryl Ell, Glidden's Western Regional Vice President, to discuss Greathouse's possible employment with Glidden.

---

* Former Justice Maurice Amidei sitting by assignment.

Bruce Cahoon, Director of Compensation and Benefits for ICI Paints, which owned Glidden, also participated in the meeting via telephone conference call. Greathouse claims that Ell and Cahoon represented to him that if he accepted employment with Glidden, he would receive a severance package similar to what he then had with Grow Group, if his employment with Glidden was terminated for any reason. In September 1995, Greathouse accepted a position with Glidden, signing a letter containing the employment agreement. By its terms, the Greathouse Glidden employment agreement rendered any prior agreements between Greathouse and Grow Group "null and void."

Greathouse's employment with Glidden required Greathouse to relocate from Houston to Dallas. As part of the new employment package, Glidden offered Greathouse a three-year, interest-free loan for twenty percent of the purchase price of a new home in Dallas. The loan would become immediately due and payable, accruing interest at the prime rate quoted by *The Wall Street Journal,* if Greathouse's employment with Glidden should terminate for any reason or if he sold his home. In January 1996, Greathouse executed a $53,000 promissory note, payable on demand, to Glidden.

In early June 1997, Greathouse voluntarily left his employment at Glidden. He submitted a claim for severance pay in the amount of $141,000. Glidden denied Greathouse's claim. In addition, Glidden demanded payment of the $53,000 note Greathouse had signed in connection with his purchase of a new home in Dallas. When Greathouse refused to repay the loan, Glidden brought suit to collect on the note. Greathouse then sued Glidden to recover the claimed severance benefits, which Glidden had refused to pay. Greathouse asserted claims for breach of con-

tract, fraud, and fraudulent inducement; and alternatively, Greathouse sought severance pay under ERISA.

After a bench trial, the court entered a take nothing judgment in favor of Glidden on all of Greathouse's claims. The court awarded Glidden full recovery of principal, interest and attorney's fees on its collection suit.

### B. Trial Court's Findings on Greathouse's Claims

With respect to Greathouse's claims, the trial court found Glidden had established an employee welfare benefit plan within the meaning of ERISA; Greathouse was subject to the terms of Glidden's employee welfare benefit plan; Greathouse's state law causes of action for breach of contract, fraud, and fraud in the inducement were preempted by ERISA; and Glidden did not abuse its discretion in denying Greathouse's claim for severance pay because severance pay was not available to employees who voluntarily resigned from Glidden. The trial court, accordingly, ordered that Greathouse take nothing on his claims against Glidden.

### C. Trial Court's Findings on Glidden's Claim

With respect to Glidden's claim under the promissory note, the trial court found Greathouse owed Glidden $53,000, plus interest accrued since the date Greathouse left his employment with Glidden. The trial court awarded Glidden damages in the amount of $53,000, interest in the amount of $7,146.29, and attorney's fees and expenses in the amount of $13,870.27 for the prosecution of Glidden's suit to recover on the note, $10,000 for appeal to the court of appeals, and $5,000 for petition for review to the Texas Supreme Court.

## D. Issues Presented on Appeal

Greathouse appeals the trial court's findings and conclusions that Glidden had established an employee welfare benefit plan subject to ERISA; Greathouse was subject to the terms of Glidden's employee welfare benefit plan; and Greathouse's state law causes of action for breach of contract, fraud, and fraud in the inducement were preempted by ERISA.[1] With respect to Glidden's award on the promissory note, Greathouse does not dispute that Glidden advanced him the money, nor does he contest the amount of the advance, or that Glidden is entitled to repayment of the loan, subject only to any right of offset to which he claims that he is entitled. Greathouse, however, challenges the amount of attorney's fees awarded to Glidden.

## II. STANDARD OF REVIEW

We review the trial court's findings of fact for legal and factual sufficiency of the evidence by the same standards applied in reviewing the evidence supporting a jury's finding. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994); *Skrepnek v. Shearson Lehman Bros., Inc.,* 889 S.W.2d 578, 579 (Tex.App.—Houston [14th Dist.] 1994, no writ). When reviewing the legal sufficiency of the evidence, we consider only the evidence and inferences tending to support the trial court's finding, disregarding all contrary evidence and inferences. *South-western Bell Mobile Sys. v. Franco,* 971 S.W.2d 52, 54 (Tex.1998) (per curiam). A "no evidence" point will be sustained if there is no more than a scintilla of evidence to support the finding. *General Motors Corp. v. Sanchez,* 997 S.W.2d 584, 588 (Tex.1999). In conducting a factual sufficiency review, we must examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding, and set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam).[2]

When the appellant challenges the trial court's conclusions of law, the court of appeals may sustain the judgment on any legal theory supported by the evidence. *Kotis v. Nowlin Jewelry, Inc.,* 844 S.W.2d 920, 922 (Tex.App.—Houston [14th Dist.] 1992, no writ). Incorrect conclusions of law will not be reversed if the controlling findings of fact support a correct legal theory. *Id.*

## III. ANALYSIS OF ISSUES PRESENTED

### A. Employee Welfare Benefit Plan Within the Meaning of ERISA

Greathouse claims his employment arrangement with Glidden is not an "employee welfare benefit plan" subject to

---

1. On appeal, Greathouse does not challenge the trial court's finding that Glidden did not abuse its discretion in denying his claim for severance benefits because severance pay was not available to employees who voluntarily resigned from Glidden. At oral argument, Greathouse acknowledged he would not be entitled to benefits under Glidden's plan because he voluntarily resigned from Glidden.

2. We apply the forgoing standards of review for legal and factual sufficiency of the evidence with regard to Greathouse's benefits claim. Because Glidden's claim of ERISA preemption is an affirmative defense, Glidden had the burden at trial to establish Greathouse's state law claims were subject to ERISA preemption. *See Gorman v. Life Ins. Co. of N. Am.,* 811 S.W.2d 542, 546 (Tex. 1991) (holding where ERISA's preemptive effect results in a change of the application of the law, it is an affirmative defense). Similarly, we apply the same standards of review to Glidden's award for attorney's fees on its claim on the promissory note because Greathouse did not have the burden of proof.

ERISA. An employee welfare benefit plan is defined, in relevant part, as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization ... for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits,....

29 U.S.C. § 1002(1) (1999). A plan under ERISA is established if, from the surrounding circumstances, a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits. *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir.1982).

■ At trial, Cahoon, the individual involved in the establishment and administration of policies regarding Glidden's benefits programs, testified that Glidden's benefits plan is filed with the United States Department of Labor and applies to each of Glidden's 5000 employees. Glidden's Employee's Benefits Handbook sets forth a comprehensive list of benefits plans and programs that Glidden makes available to its employees, including medical, prescription drug, and dental plans, tax free healthcare and daycare spending accounts, life and disability insurance, tuition aid, and termination payments. The handbook also explains the procedures for enrolling in such programs, for making claims, and for appealing the denial of claims. Additionally, the handbook identifies ICI Paints (Glidden's owner) as the sponsor of the benefit plans and the ICI Employee Benefits Committee as the administrator for each plan. The handbook further contains a "Statement of ERISA Rights" for each plan. It is clear from the record that Glidden has established an employee welfare benefit plan within the meaning of ERISA. *See id.*

■ Greathouse contends Glidden's severance benefits are not part of a plan subject to ERISA because an eligible employee can elect to receive a lump sum payment. In support of this argument, Greathouse cites to *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). In *Fort Halifax*, the United States Supreme Court considered whether a Maine statute requiring employers to provide a one-time severance payment to employees in the event of a plant closing is preempted by ERISA. *Id.* at 3–4, 107 S.Ct. 2211. The statute specifically provided that any employer terminating operations at a plant with 100 or more employees, or relocating those operations more than 100 miles away, must provide one week's pay for each year of employment to all employees who had worked in the plant for at least three years. *Id.* at 5, 107 S.Ct. 2211. The United States Supreme Court held the statute was not preempted by ERISA because it did not establish or require the employer to maintain an employee welfare benefit plan under ERISA. *Id.* at 6, 107 S.Ct. 2211. In reaching its conclusion, the *Fort Halifax* court explained:

> The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well *never* have to pay the severance benefits. To the ex-

tent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

*Id.* at 12, 107 S.Ct. 2211 (emphasis in the original).

Greathouse also relies on two cases decided by the United States Fifth Circuit Court of Appeals, *Fontenot v. NL Indus.*, 953 F.2d 960, 961 (5th Cir.1992), and *Wells v. General Motors Corp.*, 881 F.2d 166, 168 (5th Cir.1989). In *Fontenot*, the employer had instituted a senior executive severance plan, i.e., a "golden parachute" plan, providing that if an executive were terminated within two years of a change in control, the company would pay the executive a lump sum cash payment of three times his highest annual salary for the preceding three years, plus a three-year continuation of certain benefits. *Fontenot*, 953 F.2d at 961. Relying on *Fort Halifax*, the *Fontenot* court determined that because the severance plan involved only a one-time lump sum payment triggered by a single event, which might never materialize, and required no administrative scheme, it was not a plan governed by ERISA. *Id.* at 962. Specifically, the *Fontenot* court noted the plan required no administrative

scheme because those employees included in the plan were to receive benefits upon termination *regardless* of the reason for termination. *Id.* at 963.

*Wells* involved a different factual scenario but reached a similar result. Under a separation agreement, negotiated after the announcement of layoffs, employees could opt for a severance payment in lieu of preserving seniority and rehire rights. *Wells*, 881 F.2d at 168. Also relying on *Fort Halifax*, the *Wells* court observed that General Motors had established a procedure by which employees could elect to receive a one-time lump payment if they ceased working at the plant. *Id.* at 176. Because the plan was not ongoing and there was no need for continuing administration of the payment program, it was not a plan within the meaning of ERISA. *Id.*

The severance plans in *Fort Halifax*, *Fontenot*, and *Wells* are clearly distinguishable from the severance plan in this case. Glidden is not an employer that was closing its facilities or laying off employees. Here, the payment of severance benefits requires a determination of eligibility over an indefinite period of time, which necessarily requires an administrative scheme.[3] *See Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 76 (2nd Cir.1996) (finding the severance plan was subject to ERISA because it was not limited to a single payment or a short time span upon a plant or office closing, but required managerial discretion and a separate analysis of each employee in light of certain criteria); *Whittemore v. Schlumberger Tech. Corp.*, 976 F.2d 922, 923 (5th

---

**3.** Under Glidden's plan, employees are eligible for termination pay based on company initiated terminations for lack of work regardless of the reason, including the termination or transfer of an operation or function, and a management decision that, although an employee has done his best, performance is not acceptable. Termination pay is not available

for voluntary resignation, unsatisfactory job performance, failure to return from leave of absence, sale of a facility by the company if employment is continued at comparable compensation and the employee does not have to travel more than an additional 35 miles, and non-adherence to company policies and regulations.

Cir.1992) (finding the severance plan was subject to ERISA because it was not created with a particular closing in mind, but had been in existence for some time and required an administrative set-up in order to make severance payments to employees); *Pane v. RCA Corp.*, 667 F.Supp. 168, 170–71 (D.N.J.1987), *aff'd*, 868 F.2d 631 (3rd Cir.1989) (finding the severance agreement was subject to ERISA because it provided that an employee was entitled to benefits only if a triggering event such as the termination of an employee for reasons other than cause occurred, thereby requiring the analyzing of the circumstances of each employee's termination); *Hand v. Church & Dwight Co.*, 962 F.Supp. 742, 745 (D.S.C.1997) (stating that in determining whether a severance agreement establishes a separate, ongoing administrative scheme often turns on the discretion that the agreement allows in determining the payment of benefits); *Gilmore v. Silgan Plastics Corp.*, 917 F.Supp. 685, 687 (E.D.Mo.1996) (stating the determinative factor in ascertaining whether a severance plan requires an ongoing administrative scheme subject to ERISA is whether the plan requires a case-by-case review of employees to determine their particular eligibility based on applicable criteria). Thus, the employee welfare benefit plan is subject to ERISA.[4]

■ Finally, Greathouse claims his situation is "unique" because he was coming from a limited population of prospective employees of an acquired company, and was the potential recipient of compensation due to a change in control agreement. These arguments necessarily require a finding that Glidden's employee welfare

benefit plan was somehow modified or amended with respect to Greathouse. The rules governing the amendment and modification of plans subject to ERISA are well defined. ERISA requires that every "employee benefit plan shall be established and maintained pursuant to a written instrument ." *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290, 1296 (5th Cir.1989) (quoting 29 U.S.C. § 1102(a)(1)). ERISA further requires that a plan "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." *Borst v. Chevron Corp.*, 36 F.3d 1308, 1323 (5th Cir.1994) (quoting 29 U.S.C. § 1102(b)(3)). The Fifth Circuit, explaining the policy reasons underlying these requirements, stated:

> The policy behind the "written instrument" clause in ERISA is to prevent collusive or fraudulent side agreements between employers and employees. But for the "written instrument" clause, employ[ers] could discriminate in favor of certain plan participants to the detriment of others. In addition, the writing requirement gives the plan's participants and administrators a clear understanding of their rights and obligations.... Furthermore, the writing requirement protects the plan's actuarial soundness by preventing plan administrators from contracting to pay benefits to persons not entitled to such under the express terms of the plan.

*Cefalu*, 871 F.2d at 1296. Therefore, ERISA precludes all oral modifications and written modifications which do not purport to be formal amendments of a plan. *Borst*, 36 F.3d at 1323; *Degan v.*

---

4. In an effort to avoid the application of ERISA, Greathouse asserts the calculation of the full amount of his compensation could be determined easily by multiplying his last paycheck by two weeks' pay for every year of service, plus an additional eight weeks' pay.

However, the ease with which Greathouses's termination pay can be calculated is irrelevant. It is the fact that Glidden has an administrative scheme in place to determine which employees are eligible to receive termination pay that is determinative.

*Ford Motor Co.*, 869 F.2d 889, 895 (5th Cir.1989). Neither Glidden's offer of employment letter nor any alleged oral representation by Ell or Cahoon modifies or amends Glidden's employee welfare benefit plan with respect to Greathouse's claim for termination pay. Accordingly, we reject Greathouse's arguments and find that Glidden maintains an employee welfare benefit plan within the meaning of ERISA.

## B. ERISA Preemption of State Law Claims

■ Next, Greathouse contends his state law claims are not preempted by ERISA because the alleged misrepresentations regarding the circumstances under which Greathouse would be eligible to receive severance pay were made prior to the commencement of his employment relationship with Glidden. Greathouse argues that the alleged representations directly affected compensation that was originally provided by Grow Group, but was later denied by Glidden.

■ By its express terms, ERISA "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a) (1999). The United State Supreme Court has long recognized the expansiveness of ERISA's preemption provision. *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 324, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997). "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). ERISA, however, does not preempt a state law which "has only a tenuous, remote, or peripheral connection" with the plan at issue. *District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 130 n. 1, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992) (citing *Shaw*, 463 U.S. at 100 n. 21). The term "state law" includes common law causes of action relating to employee benefit plans. *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1469–70 (11th Cir.1986).

In support of his contention that his state law claims are not preempted, Greathouse relies on *Smith v. Texas Children's Hosp.*, 84 F.3d 152 (5th Cir.1996). In *Smith*, a former employee of St. Luke's Episcopal Hospital alleged that while she was employed by St. Luke's and qualified for insurance benefits, Texas Children's Hospital ("TCH") persuaded her to go to work for TCH by promising her more pay, a supervisory position, and the transfer of all benefits, including her long-term disability benefits. *Id.* at 153. Smith claimed such assurances were made both orally and in writing. *Id.* Shortly after transferring to TCH, Smith was diagnosed with multiple sclerosis. *Id.* Smith's supervisor eventually suggested it was unsafe for Smith to continue working at TCH. *Id.* The supervisor assured Smith that she would not have trouble obtaining benefits from UNUM Life Insurance Company, the claims adjuster for TCH. *Id.* Smith stopped working and went on long-term disability. Several months later, her employment terminated. *Id.* at 153–54. Following this termination, UNUM determined Smith did not qualify for disability benefits from TCH. *Id.* at 154. Smith sued TCH for breach of contract and fraudulent inducement. *Id.*

The Fifth Circuit concluded that to the extent Smith was claiming she was entitled to disability benefits under TCH's plan, her claim was preempted by ERISA because a state law claim against an employer is preempted when it is based on the denial of benefits under its ERISA plan. *Id.* at 155. The court observed that because of the nature of TCH's alleged as-

surance, i.e., that Smith would keep the same disability benefits after she transferred to TCH, the value of the benefits she gave up by leaving St. Lukes's is equal to the value of any benefits that she could claim under TCH's ERISA plan. *Id.* The *Smith* court, however, determined that Smith's fraudulent inducement claim was not based solely on TCH's denial of benefits; she also gave up her accrued benefits at St. Luke's in reliance upon TCH's alleged misrepresentations. *Id.* Therefore, to the extent that Texas law permits a plaintiff asserting fraudulent inducement to recover for value relinquished in addition to value not received, the court held Smith may also have a claim based upon the disability benefits relinquished, apart from her claim for benefits under TCH's plan. *Id.* Stated another way, Smith was not suing for disability benefits which TCH owed her under its plan; instead, she was suing TCH for vested benefits, which she had acquired while employed with St. Luke's, but then relinquished in reliance upon TCH's alleged misrepresentations. *Id.* at 157. The *Smith* court, by way of example, explained:

> [S]uppose that Smith turned down a $10,000 annual bonus by leaving St. Luke's, and that she could show that she left St. Luke's in reliance upon Texas Children's promise that she would be qualifying for benefits under Texas Children's ERISA plan valued at $12,000. Then, though a claim for $12,000 in benefits would again be preempted by ERISA, she still might have a non-preempted claim for the $10,000 relinquished bonus if her allegations indicated that Texas Children's either had no plan or otherwise knew that Smith could not possibly have been covered under whatever plan it did have. Thus, Smith's entitlement to benefits under Texas Children's ERISA plan can be considered separately from the question [of]

whether Texas Children's misled her into believing that she would be entitled to benefits under the plan; the former question requires reference to Texas Children's plan, while the latter focuses on what Texas Children's told her.

*Id.*

Likening Glidden to TCH in *Smith*, Greathouse contends Glidden induced him to relinquish his guaranteed Grow Group benefits and accept employment on the basis that he would not forfeit any right to severance pay. Greathouse testified, however, that he was not seeking benefits under Grow Group's agreement. The guaranteed benefits Greathouse is claiming are nothing more than the severance benefits which he claims Glidden owes him under its plan. In his counterclaim, Greathouse specifically sought "to recover the full value of his severance pay" on his breach of contract claim. He sought the same amount for his fraudulent inducement claim.

The amount Greathouse sought ($141,-000) is the same amount that would be calculated for severance pay under Glidden's plan, a fact amply demonstrated at trial upon Greathouse's questioning of Cahoon. Thus, the amount of damages or benefits Greathouse sought can be measured only by reference to Glidden's severance plan. The inescapable conclusion is that Greathouse's state law claims "relate to" Glidden's employee welfare benefit plan. *See, e.g., Cefalu,* 871 F.2d at 1294 (finding that to determine the measure of damages, which were pension benefits that would have been received from the plaintiff's former employer, the court must refer to the pension plan and, therefore, the precise damages and benefits sought by the plaintiff were created by the employee benefit plan); *Phillips,* 799 F.2d at 1470 (finding the plaintiffs' claim for fraud against the employer for concealing the

effect that the sale of certain operations would have on their retirement benefits was preempted by ERISA; the court observed that the damages, which were in the form of lost employee benefits, were at the "core of an ERISA claim"). Accordingly, Greathouse's state law claims for severance pay under Glidden's plan are preempted by ERISA.

## C. Claim for Wrongful Conduct under ERISA

▆▆▆▆ Greathouse complains that even if his state law claims were preempted, the trial court failed to determine Glidden's liability under ERISA for the misrepresentations purportedly made to him. Relying on *Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), Greathouse contends a participant in an ERISA plan has a private cause of action against his employer for the employer's intentional deceit. Greathouse's reliance on *Varity Corp.* is misplaced. In *Varity Corp.*, the United States Supreme Court recognized that 29 U.S.C. § 1132(a)(3) authorizes lawsuits for individualized equitable relief for the breach of a fiduciary obligation. *Id.* at 515, 116 S.Ct. 1065; *Radford v. General Dynamics Corp.*, 151 F.3d 396, 398–99 (5th Cir.1998). Section 1132(a), however, does not authorize the recovery of compensatory or punitive damages. *Varity*, 516 U.S. at 509–10, 116 S.Ct. 1065. Therefore, *Varity Corp.* is not authority for permitting Greathouse to maintain a claim under ERISA for damages for any alleged misrepresentations.

Moreover, even if Greathouse had sought equitable relief in the court below, the trial court would not have had jurisdiction to determine Glidden's liability for the alleged misrepresentations. Section

1132(e)(1) states, "[e]xcept for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by ... a participant.... State courts of competent jurisdiction and district court shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a) of this section." 29 U.S.C. § 1132(e)(1) (1999).[5] Therefore, although ERISA provides federal district courts and state courts with concurrent jurisdiction of suits brought by participants to recover benefits under a plan, it does not provide state courts with jurisdiction over claims for equitable relief.

## D. Attorney's Fees

▆▆▆▆ Finally, Greathouse challenges the award of attorney's fees to Glidden for its recovery on the promissory note. In reviewing this issue, we apply an abuse of discretion standard. *Ross v. 3D Tower Ltd.*, 824 S.W.2d 270, 273 (Tex.App.— Houston [14th Dist.] 1992, writ denied). We will not disturb the trial court's award of attorney's fees absent an abuse of discretion. *Id.* The test for whether the trial court has abused its discretion is whether it acted without reference to any guiding rules and principles, that is, whether the court's action was arbitrary or unreasonable. *Long Trusts v. Atlantic Richfield Co.*, 893 S.W.2d 686, 688 (Tex.App.—Texarkana 1995, no writ).

Greathouse claims the award of $13,870.27 is excessive and argues a more reasonable amount is $5,000 because Glidden's claim involved a limited set of facts and the amount of the note was undisputed. Glidden, through the testimony of an expert witness, sought approximately

---

**5.** Plan participants may bring a cause of action for the recovery of benefits under a plan, to enforce rights under the terms of a plan, or to clarify rights to future benefits under the terms of a plan. 29 U.S.C. § 1132(a)(1)(B) (1999).

$42,000 for attorney's fees incurred for the services performed in prosecuting the note collection suit as well as for the work performed in defending against Greathouse's state law and ERISA claims.[6]

■ The trial court may determine a reasonable fee for legal services based upon its knowledge of usual and customary rates and its review of the file. *Id.* at 687; *Budd v. Gay,* 846 S.W.2d 521, 524 (Tex. App.—Houston [14th Dist.] 1993, no writ); *Flint & Assocs. v. Intercontinental Pipe & Steel, Inc.,* 739 S.W.2d 622, 629 (Tex. App.—Dallas 1987, writ denied). Although the trial court awarded Glidden attorney's fees incurred in prosecuting its collection claim,[7] it denied Glidden attorney's fees for defending against Greathouse's claims. On this record, we conclude the trial court did not abuse its discretion in awarding Glidden $13,870.27 as reasonable attorney's fees for the prosecution of Glidden's suit to collect on the promissory note. Accordingly, Greathouse's final point of error is overruled.

The judgment of the trial court is affirmed.

MAURICE E. AMIDEI, Justice,
Assigned.

I respectfully dissent. *Smith v. Texas Children's Hosp.,* 84 F.3d 152 (5th Cir. 1996), relied on by Greathouse, supports his claim on the facts and the law. The majority tries to distinguish *Smith* by erroneously concluding Greathouse is claiming benefits under the Glidden plan because he was not seeking benefits under the Grow Group's agreement.[1] Greathouse knew he could not recover any severance benefits under the Glidden Plan because he voluntarily resigned. He does not claim any benefits under the Glidden plan. Actually, Greathouse is claiming under the letter of September 11, 1995, which superceded the change in control agreement, and the representations inducing him to sign the letter. This letter, the change in control agreement, and the representations were not shown to have been filed with the Department of Labor or made part of the plan that was so filed.

Greathouse did what he thought was necessary to make sure he did not lose his vested severance benefits if he went to work for Glidden. This is exactly what happened in *Smith v. Texas Children's Hospital,* where Smith, an employee of St. Lukes Hospital, who had qualified for insurance and disability benefits, was persuaded to go to work for the Texas Children's Hospital on promises of a better job, and the transfer of all benefits, including her long-term disability benefits. Greathouse claims that Glidden, like TCH in *Smith,* induced him to relinquish his guaranteed Devoe Paint Company/Grow Group severance pay and accept employment on the basis that he would not forfeit any right to severance pay.[2] The only reference to the Glidden plan, which is not

---

6. Glidden's expert testified that although he initially attempted to segregate the work necessary to prosecute the note collection suit from work performed in defending against Greathouse's claims, he found that such segregation was not possible because Greathouse tried to characterize the loan as a part of the severance package and, therefore, there was no way to segregate what Glidden would have to prove to enforce the note from what Glidden would have to establish in defending the state law and ERISA claims.

7. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 38.001 (Vernon 1997).

1. Greathouse knew he couldn't claim under the Grow Group agreement because it had been superceded by the September 11, 1995 letter agreement.

2. Contrary to the majority, the damages or benefits Greathouse seeks are not measured only by reference to Glidden's severance plan.

necessary to establish Greathouse's state law claims, is the formula for calculating the amount of the severance pay. It is of no consequence that the formula for such calculation was the same under Grow Group's plan as under Glidden's plan. Glidden argues that because the calculations are the same, then Greathouse is actually claiming benefits under Glidden's plan. To the contrary, Greathouse's pleadings and testimony do not amount to a claim against Glidden's ERISA plan. Rather, the guaranteed benefits that Greathouse is claiming are pursuant to the representations that induced him to sign the September 11, 1995 letter. This letter was substituted for and superceded the change in the control agreement. In his counterclaim, Greathouse specifically seeks "to recover the full value of his severance pay" on his breach of contract claim. He seeks the same amount for his fraudulent inducement claim.

The $141,000 that Greathouse seeks is the same amount as would be calculated for severance pay under Glidden's plan, which as pointed out by the majority, was demonstrated at trial upon Greathouse's questioning of Cahoon. Therefore, the amount of damages or benefits Greathouse is seeking are measured by an inconsequential reference to Glidden's severance plan and his state law claims do not "relate to" Glidden's employee welfare benefit plan. Accordingly, Greathouse's state law claims for severance pay are not preempted, and the trial court erroneously concluded Greathouse's state law claim were preempted. Even if Glidden's plan were subject to ERISA, Greathouse's state law claims are not preempted by ERISA because the misrepresentations regarding the circumstances under which he would be eligible to receive severance pay were made prior to the commencement of his employment relationship with Glidden.

ERISA "shall supercede any and all state laws in so far as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a) (1999). However, the broad "pre-emptive" reach of ERISA has been narrowed by the United States Supreme Court. "[A]pplying the 'relate to' provision [of ERISA] according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." *California Div. of Labor Stds. Enforcement v. Dillingham Constr.*, 519 U.S. 316, 335, 117 S.Ct. 832, 843, 136 L.Ed.2d 791 (1997) (J. Scalia, concurring). The Supreme Court recognized that the "relate to" language of the statute was too expansive and led to unnecessarily broad interpretations. *Travelers—De Buono v. NYSA—ILA Med. and Clinical Serv. Fund,* 520 U.S. 806, 813–14, 117 S.Ct. 1747, 1751, 138 L.Ed.2d 21 (1997). Instead, the proper analysis to determine preemption under ERISA begins with the assumption that Congress in general does not intend to preempt state law, and in the areas of "traditional state regulation" courts should assume that the police powers of the State are not superceded unless that was the clear purpose of Congress. *Dillingham,* 519 U.S. at 325, 117 S.Ct. at 838. As further observed by the Supreme Court:

[To] read the pre-emption provision as displacing all state laws affecting costs and charges on the theory that they indirectly relate to ERISA plans .... would effectively read the limiting language in § 514(a) out of the statute, a conclusion that would violate basic principles of statutory interpretation and could not be squared with our prior pronouncement that *"[p]re-emption does not occur ... if the state law has only a tenuous, remote or peripheral connection with covered plans, as in the case*

*with many laws of general applicability."*

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 661, 115 S.Ct. 1671, 1679–80, 131 L.Ed.2d 695 (1995) (emphasis supplied) (quoting *District of Columbia v. Greater Washington Bd. of Trade,* 506 U.S. 125, 130 n. 1, 113 S.Ct. 580, 583, 121 L.Ed.2d 513 n.l., (1992)). Furthermore,

> [O]ne might be excused for wondering at first blush, whether the words of limitation ("insofar as they ... relate") do much limiting. If "relate to" were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for "[r]eally, universally, *relations stop nowhere."*

*Id.* at 655, 115 S.Ct. at 1677 (emphasis supplied) (quoting H. James, Roderick Hudson xli (New York ed., World's classics 1980)).

The First Court of Appeals, in *Gulf Coast Alloy Welding v. Legal Sec. Life Ins. Co.,* 981 S.W.2d 239 (Tex.App.—Houston [1st Dist.] 1998, pet. dism'd), recognizing the foregoing trend of the Supreme Court, held that state law claims based on contract law, the Texas Insurance Code, and the DTPA, which arose out of an insurance company's misrepresentations were not pre-empted by ERISA, even though the policy in question was an employee welfare benefit plan as defined by ERISA, because the potential impact the suit had on the ERISA plan was indirect and insignificant. Gulf Coast was seeking damages as a result of the insurance company's refusal to reinstate a workplace accident insurance policy.

The suit and misrepresentations alleged by Greathouse were neither directed to nor would result in any direct impact on the administration of Glidden's ERISA plan. The severance pay had been earned, and the claimed misrepresentations were made, before any ERISA plan went into effect as to Greathouse. The severance pay Greathouse seeks originated from his employment by Devoe Paint Company, owned by the Grow Group. On April 27,-1995, Greathouse, and presumably other key management personal of Devoe and/or Grow Group, entered into a change in control agreement to induce these employees to remain in the employment of Grow Group in the event of a change of control of Grow Group. The consideration for entering into this agreement was the assurance that Greathouse would receive severance benefits as defined therein in the event his employment with the company were terminated for any reason, even upon voluntarily resignation.

This agreement, in effect, was a settlement of Greathouse's severance pay benefits and, therefore, superceded any previous plan regarding severance pay. It dedicated a fixed amount of funds for Greathouse. No administration of these benefits was necessary. A mathematical calculation was all that was necessary to determine the amount of a one-time payment that was due at the time Greathouse went to work for Glidden. *See Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (a one-time compensation requiring no more than a simple arithmetic calculation does not require an administrative program and does not qualify as an "employee benefits plan" under ERISA); *Fontenot v. N.L. Industries, Inc.,* 953 F.2d 960 (5th Cir. 1992) (a one time obligation of the employer to provide a severance payment to departing employees did not require creation of an ongoing administrative scheme and therefore did not implicate ERISA); *Wells v. General Motors,* 881 F.2d 166 (5th Cir.1989) (a unilateral one-time lump sum payment for voluntary termination of

employment was held not pre-empted by ERISA). Any severance benefits he acquired from his employment by Glidden would be under Glidden's ERISA plan. Instead, Greathouse is seeking vested benefits which he acquired while working for Devoe Paint Company but relinquished in reliance upon Glidden's misrepresentations.

At the time Greathouse was asked to accept employment with Glidden, he was entitled to receive $141,000 from the Grow Group for severance pay even if he voluntarily resigned. At that point, these benefits were not Glidden severance pay plan benefits. Greathouse is not seeking any of Glidden's severance pay plan benefits. He would not be eligible under the Glidden ERISA plan because he voluntarily resigned from Glidden. Because Glidden bought out the Grow Group, it was to Glidden's advantage not to pay Greathouse $141,000 at that time and to delay paying as long as possible. This was tantamount to a no-interest loan from Greathouse to Glidden.

Therefore, the unpaid $141,000, and the other assets and obligations of the Grow Group, were assumed by Glidden when it bought the Grow Group. The Glidden ERISA plan was established only on funding from its operations, not from the Grow Group. The $141,000 should have been, and probably was, kept in a separate account from the Glidden ERISA plan. Even if it was not kept separate, the impact on the ERISA plan if Greathouse recovers the $141,000 would be remote and insignificant because the money should not have been commingled with the ERISA plan funds, and the withdrawal of that money would not affect the benefits of the other employees in the plan. Greathouse would only be entitled to recover the amount he earned and bargained for before he went to work for Glidden. He cannot recover any funds from the Glidden plan pursuant to that plan, but his claimed severance pay can be considered separately from any reference to that plan.

For above reasons, the judgment of the trial court should be reversed and the case remanded for a trial on Greathouse's state law causes of action.

MAURICE E. AMIDEI, Justice, Assigned.

For the reasons stated in my original dissent, I respectfully dissent to the Court's decision to overrule the motion for rehearing en banc.

Panel consists of Justices FOWLER, YATES, ANDERSON, HUDSON, EDELMAN, WITTIG, FROST, SEYMORE, MURPHY, and AMIDEI.** (EDELMAN, WITTIG and SEYMORE, JJ., join in this dissent).

■

** Senior Chief Justice Paul C. Murphy and

Former Justice Amidei sitting by assignment.