Affirmed and Memorandum Opinion filed October 27, 2005









Affirmed and Memorandum Opinion filed October 27, 2005.

 

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-04-00605-CV

____________

 

ASHFORD.COM,
INC.,
Appellant

 

V.

 

CRESCENT
REAL ESTATE FUNDING III, L.P., Appellee

_____________________________________________________________________

 

On Appeal from the 11th District Court

Harris County, Texas

Trial Court Cause No. 03-05723

_____________________________________________________________________

 

M E M O R A N D U M   O P I N I O N

Ashford.com, Inc. (AAshford@),
appeals from a judgment in a landlord-tenant dispute in favor of Crescent Real
Estate Funding III, L.P. (ACrescent@).  In four issues, Ashford contends the evidence
is insufficient to support the trial court=s
judgment and its award of damages to Crescent. 
Ashford specifically alleges it did not default on its lease, but
rather, it was constructively evicted when Crescent enforced an unauthorized
lock-out.  Alternatively, Ashford urges
this court to suggest a remittitur of certain damages and attorney fees because
Crescent failed to prove it was entitled to the amount awarded.  We affirm.








Factual and Procedural Background

Ashford
and Crescent entered into a commercial lease for various office, retail, and
storage space.  The 90-page lease was amended
and revised several times over the course of its term, but it was, in its
various permutations, effective from July 26, 1999, to April 30, 2003.

In early 2002, Ashford was
purchased by GSI Commerce, Inc., who immediately began to dramatically taper
Ashford=s
business operations.  In December 2002,
Ashford sold its inventory, fixtures, and leasehold improvements located on the
leased premises to a third party, Times Past, Inc.  During the weekend of January 25, 2003,
Ashford permitted Times Past to enter the premises and remove virtually all
inventory, fixtures, and improvements. 
While Times Past was removing these items, it allegedly caused
substantial damage to the walls and ceiling of the leased premises.[1]

On January 29, 2003, Crescent
inspected the premises and determined the damage was so severe, it needed to
close two areas of the property. 
Crescent also posted two guards in the remaining portions of the leased
premises to (1) maintain the status quo, (2) prevent further damage to the
leased premises, and (3) to safeguard persons from potentially hazardous
conditions within the damaged areas. 
Crescent claimed the primary reason for the Alockout@ was a
concern for asbestos exposure caused by holes in the walls and ceiling.[2]  Due to the asbestos concern, Crescent hired
an independent environmental-engineering consultant to perform air-sample tests
in the asbestos-ridden areas.  The
results of the tests were returned to Crescent on the evening of Friday,
January 31, 2003.








On January 31, Ashford sent a
letter to Crescent challenging its authority to close the damaged areas and
asserted that Crescent=s action
constituted a constructive eviction.  On
Monday, February 3, Crescent advised Ashford that the environmental testing had
determined the asbestos danger was minimal and further explained that Crescent
would re-open the two quarantined areas once the holes had been repaired so as
to prevent further disturbance of the asbestos. 
In fact, Crescent told Ashford that it would be permitted to re-enter
the two areas within 24 hours.  In addition,
Crescent notified Ashford that its February rent was past due and explained
that failure to pay the rent would be considered an automatic AEvent of
Default@ under
the terms of the lease.[3]

Ashford again responded with a
letter reiterating its constructive eviction claim.  Ashford said it considered the Alockout@ both
unlawful and a breach of the lease. 
Accordingly, it denied owing either the February or any remaining rent
due under the lease.  Further, Ashford
demanded a return of its security deposit and a rent refund for the last few
days of January.

Crescent, in turn, filed its
original petitionCinitially
seeking almost $1 million in damagesCand a
request for a temporary restraining order and temporary injunction.  The following day, Crescent sent notice that
it was formally terminating Ashford=s right
of possession to the leased premises. 
Crescent also explained that under the terms of the lease Ashford=s
obligations remained in effect and, thus, Ashford owed the remaining three
months rent.  Finally, Crescent stated it
was retaining the security deposit as partial payment of the February rent
arrearage.








Ashford responded by filing a
general denial.  It also counterclaimed
for breach of the lease, constructive eviction, and conversion.  Ashford also requested its own temporary restraining
order and temporary injunction.[4]  On April 23 and 25, 2003, a bench trial was
held.  The trial court subsequently
entered judgment against Ashford and ordered it to pay damages of $346,283.69
plus interest and $74,735.00 in attorney fees.[5]  Ashford then filed a motion to amend the
final judgment or, in the alternative, for a new trial, and the court held a
hearing on the motion.  At the conclusion
of the hearing, the trial court denied Ashford=s request
for a new trial, but suggested a remittitur of $40,000.  Crescent agreed and final judgment was entered
against Ashford for $306,283.69 in damages, plus interest and attorney fees.

Standard of Review

When a bench trial is conducted
and the court does not enter findings of fact and conclusions of law to support
its ruling, all facts necessary to support the judgment are implied.  BMC Software Belg., N.V. v. Marchand,
83 S.W.3d 789, 795 (Tex. 2002); Zac Smith & Co. v. Otis Elevator Co.,
734 S.W.2d 662, 666 (Tex. 1987).  Because
the trial court granted judgment for Crescent, but did not enter specific
findings of fact or conclusions of law,[6]
we review Ashford=s
complaints with the presumption that all findings and conclusions were made in
favor of Crescent.

However, when the appellate
record includes the reporter=s and
clerk=s
records, implied findings are not conclusive and may be challenged on the basis
of legal and factual sufficiency.  BMC
Software Belg., 83 S.W.3d at 795. 
Here, Ashford ultimately complains of the trial court=s
judgment on legal and factual sufficiency grounds.  More specifically, Ashford contends the
evidence indicates CrescentCnot
AshfordCactually
breached the lease.  Ashford also
contends the evidence on damages and attorney fees was insufficient.  Thus, we will review Ashford=s points
of error under the well established standards for complaints regarding
sufficiency of the evidence.








We review the trial court=s
decision for legal and factual sufficiency of the evidence by the same
standards applied in reviewing the evidence supporting a jury=s
finding.  Lenz v. Lenz, 79 S.W.3d 10, 19
(Tex. 2002); Catalina v. Blasdel, 881 S.W.2d 295, 297
(Tex. 1994).  When reviewing the legal
sufficiency of the evidence, we review the evidence in light most favorable to
the challenged finding and indulge every reasonable inference that would
support it.  City of Keller v. Wilson,
168 S.W.3d 802, 822 (Tex. 2005).  We
credit favorable evidence if a reasonable fact finder could and disregard
contrary evidence unless a reasonable fact finder could not.  Id. at 827.  The evidence is legally sufficient if it
would enable fair-minded people to reach the verdict under review.  Id. 
Therefore, we must examine the record in this case to determine whether
some evidence exists to support the court=s
judgment.

In reviewing the factual
sufficiency of the evidence, we must consider and weigh all the evidence and
should set aside the judgment only if it is so contrary to the overwhelming
weight of the evidence as to be clearly wrong and unjust.  Cain v. Bain, 709 S.W.2d 175, 176
(Tex. 1986).  We may not substitute our
own judgment for that of the trier of fact, even if we would have reached a
different result on the evidence.  Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998).  Therefore, we will reverse only if the
overwhelming weight of the evidence indicates the trial court=s
judgment for Crescent was clearly wrong and unjust.

Breach of the Lease








In its
first issue, Ashford contends the trial court erred in holding that Ashford,
rather than Crescent, defaulted on or otherwise breached the lease.  Specifically, Ashford claims even if it
wrongfully removed fixtures or improvements from the premises, this action
constituted a non-monetary breach. 
According to the lease, this type of breach is not considered an Aevent of
default@ until
Crescent provides written notice and an opportunity to cure and Ashford fails
to properly cure.  Similarly, Ashford
contends that any damage to the premises was not an Aevent of
default@ unless
or until the predicate notice, opportunity, and failure to cure had been
met.  Finally, Ashford suggests that
Crescent knew there was no real threat posed by the asbestos and, therefore,
the Aemergency@ justification
for the lockout was merely a pretext. 
Accordingly, Ashford concludes it did not default on or otherwise breach
the lease, but rather, it was unlawfully locked-out and constructively evicted
thereby allowing it to lawfully terminate the lease and escape liability from
all remaining obligations.

The Texas Property Code generally
forbids a landlord from excluding or locking-out a tenant from property which
is the subject of a valid lease agreement. 
See Tex. Prop. Code Ann.
' 93.002
(Vernon 1995).  When such a lockout
occurs, the tenant is entitled to recover possession of the premises or
terminate the lease and recover damages from the landlord.  Id. '
93.002(g).  However, the Code also
provides an exception where the lock-out results from Abona fide
repairs, construction, or an emergency.@  Id. '
93.002(c)(1).  Thus, where a landlord has
properly excluded a tenant for Abona fide
repairs, construction, or an emergency,@ the
landlord is shielded from liability. 
Here, we find sufficient evidence to support the trial court=s implied
holding that Crescent validly exercised its right to exclude Ashford under
section 93.002(c)(1) of the Property Code.

The record indicates that while removing various
fixtures and improvements, Times Past inflicted substantial damage to the
leased premises.  For example, an
affidavit from Robert Carlen, Crescent=s
Property Management Vice President, stated:

In my 22, plus, years involved in the management and leasing of . . .
commercial office space, I have never seen a vacating tenant inflict the
damage, destruction, and removal of valuable interior, finish fixtures as has
occurred with [Ashford=s] Retail Lease Space. . .
.  [Crescent] likely could have re-leased
to a future retail tenant with minimal modification and renovation, but for the
damage and fixture removal inflicted upon the space by [Ashford].

 








In addition, photographic evidence provided
at trial depicts the destruction exacted by Times Past.  It appears that while removing cabinetry,
display cases, a sink, and other related improvements, Times Past created numerous
holes in the walls throughout the retail space. 
Also, while removing light fixtures, Times Past produced large holes in
the ceiling.  These holes ranged in size
from a few inches to several feet in diameter. 
The creation of these holesCand the
inherent need to repair themCprovided
sufficient justification for Crescent to temporarily exclude Ashford from the
premises.  See Tex. Prop. Code Ann. '
93.002(c)(1) (permitting a landlord to exclude a tenant for Abona fide
repairs@).

Further, the perceived danger
created by Times Past=s
destruction of the walls and ceiling also permitted Crescent to exclude
Ashford.  Id.  Crescent offered evidence of a dual
danger.  First, Crescent was concerned
about potentially Ahot@
electrical wires that were left hanging from the ceiling.  To alleviate this concern, Crescent
immediately contacted an electrician and paid for both an electrical survey and
the capping of the Ahot@
wires.  Thus, Crescent was exercising not
only a right, but possibly an obligation, to prevent anyone from coming into
contact with dangerous, exposed electrical wires.








Second, Crescent was concerned
about the risk of potential asbestos exposure. 
Ashford was aware that the building contained asbestos fire-proofing
material and was specifically admonished not to disturb the material by
puncturing the ceiling.[7]  Notwithstanding these admonitions, Times Past
created a number of sizeable holes in the ceiling when it removed the light
fixtures and other improvements.  On
January 29, 2003Cthe same day
it discovered the damage inflicted on the premisesCCrescent
immediately ordered an environmental engineering survey to be conducted.  To minimize the risk of asbestos exposure,
Crescent also quarantined the at-risk area and excluded Ashford until results
of the asbestos testing indicated it was safe to return.  Crescent received these results on the
evening of Friday, January 31.  Crescent
informed Ashford on Monday, February 3Cthe very
next business dayCthat the
results showed no apparent risk of exposure and that Ashford would be permitted
to re-enter the space as soon as the holes were patched, i.e., within 24 hours.

At trial, Crescent presented
nearly 100 color photographs detailing how the premises looked both before and
after Times Past entered the building. 
Crescent also introduced into evidence copies of the environmental
testing results and all written communications with Ashford regarding the Aemergency@
situation and temporary lockout.  The
testimony of Crescent=s
witnesses was that, at all times, Crescent considered the lockout extremely
important, but also of a temporary duration.[8]  In addition, Wally Capps, a fifteen-year
veteran in asbestos-related environmental clean-up, testified as an expert on
Crescent=s
behalf.  Capps participated in the
clean-up at Five Greenway Plaza and explained that, based on the condition of
the premises, it was both Aprudent@ and Anecessary@ for
Crescent to secure the areas as it did.








In rebuttal, Ashford
cross-examined several witnesses in an effort to elicit testimony that Crescent
knew there was no threat of exposure on January 29.  While some evidence suggests there was no
immediate threat of asbestos exposure, this evidence was based primarily on a
cursory inspection of the premises. 
However, Crescent=s expert
witness stated at trial that quarantining the area for further testing was
necessary and prudent.  Considering the
evidence in the light most favorable to the trial court=s
decision, we find it legally sufficient to sustain the judgment.  Furthermore, after reviewing the entire
record, we find the trial court=s
judgment was not so contrary to the overwhelming weight of the evidence as to
be clearly wrong or unjust.  Accordingly,
we affirm the trial court=s
decision insofar as it determined Crescent did not violate the lease by
excluding Ashford from the two areas in Five Greenway Plaza.

We also refuse to overturn the
trial court=s decision on grounds that
Crescent breached the lease by hiring security guards to prevent further damage
to the remaining leased space.  Nothing
in the record suggests the guards prevented access or otherwise interfered with
Ashford=s
business in the remaining space.  In
fact, trial testimony indicates Ashford was allowed to continue its normal
business operations.  Therefore, absent
evidence the guards excluded Ashford employees or otherwise substantially
interfered with its normal activities, Ashford=s
sufficiency challenges cannot be sustained on this basis.

Turning to whether or not Ashford
defaulted on the lease, we find the evidence sufficiently supports the trial
court=s
judgment on this issue.  Having already
determined that Ashford was not unlawfully locked out, we agree with the trial
court=s implied
finding that Ashford defaulted on the lease. 
More specifically, because Ashford was not unlawfully locked out, it was
not entitled to terminate the lease or otherwise avoid the remaining lease
obligations under section 93.002 of the Property Code.  Therefore, Ashford=s refusal
to pay the February rent and all future rents was a breach of the
agreement.  








According to the terms of the
lease, once Ashford failed to pay rent for the third time in a twelve-month
period, Crescent was entitled to immediately terminate Ashford=s right
of possession.[9]  It is undisputed that Ashford had failed on
two prior occasions within the preceding twelve months to timely pay rent.  When Ashford refused to pay rent on
the third occasion, its refusal became an automatic Aevent of
default,@ thus
entitling Crescent to terminate Ashford=s right
of possession upon a single, informative notice.   In addition, Crescent was entitled under the
terms of the lease to enforce all remaining obligations, including the
collection of rent.  Therefore, based on
the express terms of the lease and the evidence presented at trial, the trial
court=s
decision regarding Ashford=s breach
was neither clearly wrong nor unjust. 
Accordingly, we hold the evidence is both legally and factually
sufficient to sustain the trial court=s
decision, and overrule Ashford=s first
issue.

Damages for Unpaid Rent

In
Ashford=s second
issue, it complains the evidence does not support the amount of damages awarded
for unpaid rent.[10]  More specifically, Ashford argues: (1)
Crescent failed to prove it was entitled to certain Aexcess
operating expenses@ under
the lease; (2) the trial court failed to reduce the award for alleged
mitigation because Crescent leased part of the premises to another tenant; and
(3) the trial court erred by not reducing the award for the wrongful lockout
period.  According to Ashford=s
calculations, the total amount of damages for unpaid rent should have been
$14.25 per foot, or alternatively, $139,441.98.[11]

Excess Operating Expenses








Initially, Ashford attacks the
sufficiency of Crescent=s proof
regarding Aexcess operating expenses@ (AEOE@) owed
under the lease.  Ashford concedes that
the lease required monthly rent payments of $89,237.79 plus [1]/12
of Crescent=s good-faith estimate of its
EOE.  However, Ashford contends there was
insufficient evidence that Crescent=s EOE
claim was a good-faith estimate.

Reviewing the record in this
case, we note that the lease provided a detailed description of charges to be
included and excluded in the calculation of EOE.  Crescent provided billing statements listing
all the EOE charges for the months of February through April 2003.  Rob Roy, general manager in charge of the
subject properties, testified that Crescent audits the billing and financial
statements every year to ensure the EOE charges are accurate.  Moreover, Roy stated that he personally signs
off on the EOE calculations included in the statements.  On cross-examination, Ashford challenged Roy
regarding the accuracy of the February to April statements.  Ashford pointed out that Roy did not personally
do the EOE calculations and further noted that the numbers included in the
billing statements were not necessarily the final amounts Ashford would be
charged.  However, nothing in Roy=s
testimony or in any other evidence presented by Ashford indicates the numbers
provided by Crescent were incorrect or that they were not a good faith
estimate.  

Keeping the appropriate standard
of review in mind, we find the trial court=s judgment
and award of damages on this point is supported by the evidence.  Moreover, we cannot say the court=s
decision was so contrary to the overwhelming weight of the evidence as to be
clearly wrong or unjust.

Mitigation
Reduction








Ashford next argues that the
trial court erred by not reducing the damage award for mitigation because
Crescent was able to re-let a portion of the premises to another tenant,
Occidental Oil and Gas (AOxy@).  Ashford points out that Crescent required 45
days for Abuild-out@ and Amake-ready@
activities before Oxy could move into the leased space.  Ashford argues that, had it not moved out
early, this 45-day period would have precluded Crescent from receiving rent
from Oxy until June 1.  However, because
Crescent was able to begin the Abuild-out@ process
when Ashford left, it received rent from Oxy much earlier.  Thus, Ashford argues that it was entitled to
a mitigation credit for 45 days, or $39,047.85.[12]

On the other hand, Crescent
argues that it was required to provide an offset for only 10 days in
April.  Crescent notes that the Oxy lease
was not signed until April 15, 2003, and that no steps were taken in the Abuild-out@ process
until April 21.  Crescent concedes that
it was provided 10 additional days, April 21B30, in
which to prepare the leased space for Oxy. 
Therefore, Crescent argues that Ashford was entitled to a mitigation
credit, if any, for only 10 days, or $8,124.82.[13]








Here, the lease provided that, upon termination of Ashford=s right
of possession, Crescent was entitled to recover Aall Rent
accrued through the end of the month in which termination becomes effective,
[i.e., February]@ plus ALandlord=s Rental
Damages@equal to the difference between
what Ashford owed for the remaining term and any amount actually received by
Crescent once it re-let the premises.[14]  Thus, Crescent agreed to provide a prorated
offset for the 10 days in which it was able to begin the Abuild-out@ process
early.  Moreover, it appears from the
record that both Crescent=s request
and the trial court=s award
included this offset.  Because the
evidence is legally and factually sufficient to support the award of damages,
we refuse to overturn the trial court=s
decision regarding the mitigation credit Ashford received.  

Rent for
Six Days= Lockout

Finally,
Ashford argues the trial court erred in refusing to reduce the damages for
unpaid rent for the six days of Awrongful
lockout.@  Alternatively, Ashford claims that even if
the lockout was not a breach of the lease, it was a violation of the covenant
of quiet enjoyment.  Therefore, Ashford
requests a remittitur of six days= rent, or
$17,847.54.[15]   

As we have already observed, the
trial court impliedly found the lockout was not wrongful.  After considering all the evidence, the trial
court concluded that Crescent was entitled to $212,500.55 in damages for unpaid
rent.  After making our own review of the
evidence, we find Crescent=s actions
were justified under both the Texas Property Code and the lease.  See Tex.
Prop. Code Ann. '
93.002(c)(1).  Therefore, we
disagree with Ashford=s
contention that any further reduction was required in the calculation of
damages for unpaid rent.  At the very
least, the evidence is neither legally nor factually insufficient to undermine
our confidence in the trial court=s
decision.  Accordingly, we overrule
Ashford=s second
issue.

Damage for Repairs








In
Ashford=s third
issue, it argues the evidence does not support the trial court=s award
of $114,779 in repair damages.  Ashford
does not dispute that it owed $13,064 for sheet rock repair/replacement.  Instead, Ashford claims Crescent failed to
prove it was entitled to the remaining damages, namely $57,754 for electrical
repair and $26,945 for replacement of certain millwork, or cabinetry.  Accordingly, Ashford claims the trial court
should have awarded, at most, $18,009.25 for repair damages.[16]

Electrical Repair

Ashford=s primary
complaint regarding Crescent=s
electrical repair claim is that the request was not based on a current, working
estimate of the necessary repairs.  In
other words, Ashford contests the estimate because (1) allegedly, it was not
based on personal knowledge of the contractor, and (2) nothing established it
was reasonable based on the work actually required.  

At trial, Johnny York, president
of Cactus Builder=s
Incorporated, testified about the basis for the electrical repair
estimate.  York explained that his
company had been hired by Crescent to act as the general contractor for the
repair project.  York testified that, in
formulating his own bid,  he asked a
subcontractor, Midwest Electric Company (AMidwest@), to
conduct an onsite survey of the premises and review the initial construction
documents from 1999.  York explained that
Midwest took a look at the space and submitted a bid accordingly.  Based on Midwest=s bid,
York devised his own proposal indicating what he believed the job would
cost.  Both Midwest=s bid and
York=s
proposal letter were introduced as evidence to support Crescent=s claim
for electrical repairs.  In addition,
York testified on cross-examination that his proposal was competitive and
fair.  In fact, York claimed the markup
on the proposal was Aless than
normal@ and
explained that, if anything, the proposal was Aunder
fair@ to
Cactus Builder=s, Inc.








Ashford sought to refute Crescent=s damage
estimates through the testimony of Peter de la Mora, an engineering consultant
designated as an expert witness.  De la
Mora testified that he conducted an independent review of the premises and
determined that the electrical repair/replacement costs were $4,945.25.  De la Mora further explained that this
estimate was based on an actual physical inspection of the premises.  He further claimed that, in his opinion, the
discrepancy between the two bids was due to Cactus Builders=
including repair/replacement of all light fixturesCnot just
the ones needing work.  Thus, Ashford
suggests that De la Mora=s
testimony was the only competent evidence regarding the repairs that were
actually necessary.

Because the evidence was
conflicting in this case, the trial court, as the fact-finder,  was the sole judge of the witnesses=
credibility and the weight of their testimonies.  City of Keller, 168 S.W.3d at
819.  Therefore, the trial court may
choose to believe the testimony of one witness and disbelieve that of another.  Id. 


As the reviewing court, we are
not a fact finder and cannot pass upon a witness=
credibility or substitute our judgment for that of the fact finder.  This is true even if conflicting evidence
exists that would support a different conclusion than that reached by the trial
court.  Cain v. Bain, 709 S.W.2d
175, 176 (Tex. 1986).  Considering these
tenets, and the appropriate standard of review for sufficiency of the evidence
challenges, we disagree with Ashford=s claim
that the trial court=s
electrical repair award is unsupported by the evidence.

Millwork Replacement

Ashford also claims in its third
issue that Crescent failed to sufficiently prove it was entitled to
compensation for replacement of certain millwork or cabinetry.  According to Ashford, the millwork consisted
of Atrade
fixtures@ which
are presumed to be Ashford=s
property upon termination of the lease. 
Accordingly, Ashford contends Crescent was not entitled to any damages
for replacement of property it did not rightfully own.  Alternatively,  Ashford complains that, if Crescent was
entitled to damages for replacement of the millwork, Crescent failed to provide
evidence that the replacement estimate was reasonable.








A trade fixture is an article
attached to a leasehold by a tenant which enables him to carry on the trade,
profession, or business which is contemplated by the lease.  Connelly v. Art & Gary, Inc., 630
S.W.2d 514, 515 (Tex. App.CCorpus
Christi 1982, writ ref=d
n.r.e.).  The article must be removable
without permanent or material injury to the premises.  Id.  Generally, once a lease is terminated, trades
fixtures are presumed to be the tenant=s
property and are removable at his discretion. 
Alexander v. Cooper, 843 S.W.2d 644, 646 (Tex. App.CCorpus
Christi 1992, no writ); Boyett v. Boegner, 746 S.W.2d 25, 27B28 (Tex.
App.CHouston
[1st Dist.] 1988, no writ).  However,
this discretion is subject to any contractual provisions to the contrary.  Alexander, 843 S.W.2d at 646; Boyett,
746 S.W.2d at 27B28.  Therefore, if it specifically addresses
fixtures, the lease agreement governs the parties= property
rights in fixtures.  Alexander,
843 S.W.2d at 646; Fenlon v. Jaffee, 553 S.W.2d 422, 429 (Tex. Civ. App.CTyler
1977, writ ref=d n.r.e.).

Here, the lease contains several
provision which govern improvements, alterations, and fixtures.  Ashford points out that section 18(b)
requires it to Aimmediately
remove all of [its] FF&E from the Premises@ upon
termination of the lease.  AFF&E@ is
defined elsewhere, in section 14(b), as ATenant=s
furnishings, trade fixtures, equipment and inventory.@  Ashford claims these provisions explicitly
provide its right to remove the millwork. 
In fact, Ashford argues that section 18(b) required that it
remove these items.

However, in construing the lease,
we are to examine the entire document in order to harmonize and give effect to
all its provisions so that none will be rendered meaningless.  Coker v. Coker, 650 S.W.2d 391, 393
(Tex. 1983).  No single provision taken
alone will be given controlling effect; 
instead, all provisions must be considered in relation to the whole
instrument.  Id.








After reviewing the entire lease
and considering the context of the provisions cited by Ashford, we disagree
with Ashford=s assessment of its right
regarding the millwork.  Section
18(b)(ii) actually states, Aprovided
there is no uncured Event of Default, [Ashford] shall, at its
expense, immediately remove all of [its] FF&E from the Premises.@[17]  Here, as previously explained, Ashford=s failure
to timely pay rent for the third time in a year was an event of default under
the lease.  Therefore, 18(b)(ii) is not
applicable, and we must turn to other provisions in the lease to determine the
parties= rights
and obligations regarding the millwork. 
Section 18(b)(i) provides that A[u]pon  . . . termination of [Ashford=s] right
of possession of the Premises . . . all leasehold improvements and Alterations
installed in the Premises, including all built-in fixtures and cabling,
shall become [Crescent=s]
property.@[18]

Moreover, trial testimony
regarding the millwork centered on whether it was Abuilt-in@ or
movable.  Roy, Crescent=s
property manager, stated that he believed the millwork was bolted or otherwise
affixed to the walls and/or floors in a way that made them permanent
improvements.  He also explained that, because
of their nature, he expected the millwork to remain in the premises after the
lease expired.  York, Crescent=s general
contractor, similarly described his understanding of the nature of the
improvements.  In his opinion, the items
Ashford removed were built-in fixtures and should have remained part of the
premises for future tenantsCmuch like
kitchen cabinets in a house.  York also
explained why Crescent asked him to submit two different estimates for
replacement of the improvements.  The
first estimate included every piece of shelving, cabinetry, lighting, and all
other improvements to the premises.  This
estimate totaled more than $215,000.  In
figuring the second estimate, Crescent asked York to exclude any questionable
items, viz, any improvements which were arguably movable Afurniture.@  Thus, according to Crescent, the $114,779
damage request included only those items which were undoubtedly built-in
fixtures.  

Ashford contradicted this
evidence with the testimony of its own expert and with original construction
documents indicating the cabinetry was built off-site as Afreestanding
millwork.@ 
Ashford also argues that the evidence suggests the millwork was
removable with  only minimal damage to
the walls and ceilings.  Therefore,
Ashford claims the items were removable Atrade
fixtures@ under
the common industry definition of the term.








After considering all the
evidence, the trial court found the millwork was built in and should not have
been removed by Ashford.  Because the
status of fixtures as Abuilt-in@ or removable
is a questions of fact to be determined by the trier-of-fact, the court was
entitled to make this determination.  Melendez
v. State, 902 S.W.2d 132, 137 (Tex. App.CHouston
[1st Dist.] 1995, no writ), overruled on other grounds by State Farm Fire
& Cas. Co. v. Morua, 979 S.W.2d 616 (Tex. 1998); Alexander, 843
S.W.2d at 646.  Based on our own review
of the evidence, we do not find the trial court=s
decision to be so contrary to the evidence as to be clearly wrong or unjust.

In addition, we disagree with
Ashford=s
contention that evidence of the actual damage amount is insufficient.  Much like with the electrical repair damages,
there was conflicting evidence about what the millwork replacement should cost.[19]  The court heard this evidence and resolved
the discrepancy in Crescent=s
favor.  After reviewing the record, we
cannot say this decision was clearly wrong or unjust.  Accordingly, we overrule Ashford=s third
issue.

Attorney Fees

In its
final issue, Ashford contends the evidence was insufficient to support the
award of $74,735 in attorney fees. 
Specifically, Ashford argues (1) Crescent failed to segregate its
request for attorney fees between causes of action on which it prevailed and
those which it did not,[20]
and (2) the fees were excessive considering the factual and procedural nature
of the case.








Regarding Ashford=s first
complaint, it failed to object at trial regarding the segregation of fees and,
therefore, has presented nothing for us to review.[21]  See Green Int=l, Inc.
v. Solis, 951 S.W.2d 384, 389 (Tex. 1997) (A[I]f no
one objects to the fact that the attorney=s fees
are not segregated as to specific claims, then the objection is waived.@); Aero
Energy, Inc. v. Circle C Drilling Co., 699 S.W.2d 821, 823 (Tex, 1985)
(holding failure to object to the failure to segregate attorney fees among
claims waives any complaint on appeal).

Ashford also complains the amount
awarded for attorney fees was excessive based on the Asimple@ nature
of the case.  Ashford argues the case
required very little time because there was minimal discovery, no significant
motion practice, and the trial itself was a short day-and-a-half bench
trial.  Therefore, Ashford requests
either a 50% reduction in the amount of attorney fees awarded or a reversal of
the trial court=s
decision.

We first note the prevailing
party in this dispute is entitled to recover reasonable attorney fees pursuant
to the lease agreement.[22]  See Norrell v. Aransas County Navigation
Dist. No. 1, 1 S.W.3d 296, 303 (Tex. App.CCorpus
Christi 1999, no pet.) (awarding attorney fees where a lease agreement provided
the prevailing party could recover the fees in any litigation involving the
lease); see also Holland v. Wal-Mart Stores, 1 S.W.3d 91, 95 (Tex. 1999)
(stating the prevailing party cannot recover attorney fees unless permitted by
statute or contract).  Thus, the only
question becomes whether or not the fees awarded in this case were
reasonable.  

In determining the reasonableness of attorney
fees, trial courts are to consider the following factors:








(1)
the time and labor required, and the skill required to perform the legal
service properly; 

(2)
the likelihood . . . that the acceptance of the particular employment will
preclude other employment by the lawyer; 

(3)
the fee customarily charged in the locality for similar legal services; 

(4)
the amount involved and the results obtained; 

(5)
the time limitations imposed by the client or by the circumstances; 

(6)
the nature and length of the professional relationship with the client;

(7)
the experience, reputation, and ability of the lawyer or lawyers performing the
services; and 

(8) whether the fee is fixed or contingent on results obtained or
uncertainty of collection before the legal services were rendered.

Arthur
Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818 (Tex.
1997).  We review a trial court=s
decision to award attorney fees under an abuse of discretion standard. Greathouse
v. Glidden, 40 S.W.3d 560, 571 (Tex. App.CHouston
[14th Dist.] 2001, no pet.).  A trial
court abuses its discretion when it acts Ain an
arbitrary or unreasonable manner without reference to any guiding rules or
principles.@ 
Walker v. Gutierrez, 111 S.W.3d 56, 62 (Tex. 2003).  

Crescent=s
attorney testified as to the reasonableness of the attorney fees and discussed
each of the factors outlined in Arthur Anderson & Co.  She testified that she had 20 years of
experience in real estate litigation and that, in her estimation, the fees
were:

all
reasonably and necessarily incurred based upon the unusual circumstances
presented by this case and the unusual amount of detailed attention it required
regarding the property issues and construction issues at the facility where
personalty issues of facilitating the moving of Ashford=s property and that of
third parties and the like.  The
pleadings required in this case were all necessary and reasonably prepared and
in as an efficient and customary manner as appropriate for someone of my experience
and knowledge.

 








Crescent=s counsel
also described in great detail the many actions she took on the case including
investigation, discovery, mediation, hearings on injunctive relief, and drafting
the various pleadings.  She also reported
that she had spent nearly 200 hours on the case up to the time of trial.  In addition, she discussed the assistance she
received from a colleague, a transactional real estate attorney with 15 years
experience, and listed the hours he assisted on the case.  Finally, counsel disclosed that she worked
for a discounted billing rateC$330 per
hour as opposed to $365Cand that
she did not charge for some of the time worked by an associate and a legal
assistant.  

Opposing counsel had an
opportunity to cross-examine Crescent=s
attorney regarding her fees and, after hearing all the relevant evidence, the
trial court determined the request for attorney fees was reasonable.  In light of the record before us, we find the
trial court=s award of attorney fees did not
constitute an abuse of discretion.  See
Greathouse, 40 S.W.3d 560, 571. 
Accordingly, Ashford=s fourth
issue is overruled.

The judgment of the trial court
is affirmed.

 

/s/        J. Harvey Hudson

Justice

 

Judgment rendered and Memorandum Opinion filed October 27, 2005.

Panel consists of Justices Yates, Anderson, and Hudson.

 

 











[1]  The record
indicates Ashford/Times Past removed cabinetry, light fixtures, and other
improvements, leaving holes in the walls and ceiling and exposed electrical
wires.





[2]  Crescent also
stated it was worried about Ahot@ electrical wires that were left dangling from the
ceiling.





[3]  The failure
allegedly became an automatic default because Crescent had already provided
written notice and an opportunity to cure late rental payments on two previous
occasions within the preceding 12 months. 
Under Section 17(a) of the lease, the third late rental payment within a
year was designated as a default authorizing Crescent to exercise its remedial
powers under the lease.





[4]  On February
13, 2003, the trial court entered an AAgreed
Temporary Injunction@ permitting Ashford to remove its remaining equipment
from the leased premises.





[5]  The judgment
also requires Ashford to pay an additional $20,000 in attorney fees for an
unsuccessful appeal to this court and $15,000 in the event of an adverse ruling
in the Texas Supreme Court.





[6]  Both parties
made requests for findings of fact and conclusions of law pursuant to Texas
Rules of Civil Procedure 296 and 297.  Tex. R. Civ. P. 296, 297.  To date, the trial court has not entered any
findings or conclusions.





[7]  Multiple
provisions in the lease indicated certain areas of the buildings contained
asbestos fire-proofing material.  These
provisions clearly prohibited Ashford from disturbing this material.  For example, section 11 of the ARules and Regulations@
specifically provided that:

 

. . .
pursuant to OSHA and EPA guidelines regarding asbestos containing materials, no
tenant shall cause to be open any part of the ceilings in the Building without
having first received written permission from [Crescent].  It is the intent of this policy to prevent
any ceiling from being opened . . . includ[ing] any action or penetration which
would break the plane of the ceiling surface, no matter how slight.

 





[8]  This testimony
was offered to refute Ashford=s argument that it was constructively evicted.  In order to prove its claim of constructive
eviction, Ashford was required to establish four elements: (1) an intention on
the part of Crescent that Ashford no longer use or enjoy the premises; (2) a
material act or omission by Crescent that substantially interfered with Ashford=s use and enjoyment of the property; (3) Ashford=s permanent deprivation of the use and
enjoyment of the premises;  and (4)
Ashford=s abandonment of the premises, within a reasonable
time, that was the direct result of Crescent=s act or
omission.  See, e.g., Columbia/HCA of
Houston, Inc. v. Tea Cake French Bakery & Tea Room, 8 S.W.3d 18, 22
(Tex. App.CHouston [14th Dist.] 1999, pet. denied) ( detailing
the elements necessary for constructive eviction).  Here, the evidence suggests: (1) any
interference with Ashford=s use and enjoyment of the leased space was only
temporary, and (2) Ashford had a predetermined intention to abandon the
premises well before Crescent took any action regarding the temporary
lockout.  Thus, the evidence does not
support Ashford=s contention that it was constructively evicted.





[9]  Section 17 of
the lease governed ADefaults and Remedies.@  This section specifically explained that A[Ashford=s]
failure to comply with any single provision of this Lease more than 2 times
during any consecutive 12 month period during the Term, regardless of cure,
shall be an independent Event of Default.@  The section further stated that upon an Event
of Default, Crescent was required to provide only Aa single informative notice of default, without
further opportunity to cure . . .@  Once this notice was provided, Crescent was
entitled to terminate Ashford=s right of possession without terminating the lease
and to seek all damages permitted by law and according to the lease.





[10]  The
$346,283.69 in damages was apparently apportioned by the trial court as
follows: $212,500.55 for unpaid rent; $114,779 for reparation/restoration of
fixtures and improvements; and $19,004.14 for miscellaneous damages such as
environmental testing, security, electrical work, and debris removal.  After Crescent agreed to a remittitur of
$40,000, the damage award totaled $306,283.69.





[11]  Ashford calculated
total damages as follows:

 

$89,237.89 [base rent for February] B $71,376 [security deposit refund] B $17,847.54 [lockout credit (see infra note
15)] = $14.25 total damages for unpaid rent; or alternatively,

 

($89,237.79
[base rent per month] x 3 months) B 71,376
[security deposit refund] B $39,047.85 [mitigation credit for April (see infra
note 12)] B $17,847.54 [lockout credit (see infra note
15)] = $139,441.98 total damages for unpaid rent.





[12]  Ashford
calculates the mitigation credit for 45 days as follows:

 

$26,032
[monthly rent for the two re-let areas at $10 per square foot] ) 30 days = $867.73 [avg. rent per day] x 45 days =
$39,047.85 total mitigation credit for 45 days.





[13]  Crescent
calculates the mitigation credit for 10 days as follows:

 

((13,215 sq. ft. x $10 per sq. ft.) ) 360 days) x 10 days = $3,670.83 rent

+  $1,310 [April
EOE] x 1/3 [for 10 days] = $436.67 EOE

 

  
$4,107.50 [total offset for Suite B150]

+       
((12,817 sq. ft. x $10.09 per sq. ft.) ) 360 days) x 10 days = $3592.32 rent

        +  $1,275 [April EOE] x 1/3 [for 10 days] = $425
EOE

 

   $4,017.32 [total offset for Suite B155]

 

=     
$8,124.82 total mitigation credit for 10 days.





[14]  Emphasis in
original.





[15]  Ashford
calculates six days= rent as follows:

 

$89,237.79
[base rent per month] ) 30 days = $2,974.59 [avg. base rent per day] x 6 days
= $17,847.54.





[16]  Ashford
calculates repair damages as follows:

 

$13,064
[undisputed sheet rock repair] + $4,945.25 [electrical repair based on Ashford=s estimate] + $0 [millwork replacement] = $18,009.25.





[17]  Emphasis
added.





[18]  Emphasis
added.





[19]  Both Crescent
and Ashford introduced testimony from their respective experts regarding a
reasonable cost estimate for replacement of the millwork.  In addition, Crescent provided an itemized
estimate for the work which was described as Amore
than fair.@





[20]  The lease
permitted the prevailing party in any dispute regarding the lease to recover
attorney fees.  In its original and two
supplemental petitions, Crescent included claims for: (a) waste and destruction
of property; (b) conversion of fixtures; (c) breach of the lease; (d) declaratory
relief; (e) temporary restraining order; (f) temporary injunction; (g)
foreclosure of landlord=s lien; and (h) additional damages provided for under
the lease (e.g., repair/restoration of the premises, removal of additional
equipment owned by Ashford).  It appears
from the judgment Crescent was not successful on all of these claims.  Thus, Ashford complains the fee award was not
properly segregated 





[21]  Even if Ashford
had properly preserved its complaint, we would still find no error in the
failure to segregate attorney fees in this case.  A plaintiff is not required to segregate
attorney fees where his claims arise out of the same transaction and are so
interrelated that their prosecution requires proof of essentially the same
facts.  Stewart Title Guar. Co. v.
Sterling, 822 S.W.2d 1, 10B11 (Tex. 1991); Stamp-Ad, Inc. v. Barton Raben,
Inc., 915 S.W.2d 932, 937B38 (Tex. App.CHouston
[1st Dist.] 1996, no writ).  Here,
all of Crescent=s claims stemmed from the same basic contention, viz,
that Ashford breached the lease and owed damages pursuant to numerous
provisions of the agreement.





[22]  Section 17(f)
states, A[i]n any dispute regarding this Lease, the prevailing
party shall be entitled to recover reasonable attorneys= fees, court costs and expenses from the other party.@