

NUMBER 13-11-00749-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

CITY OF MCALLEN,                                               Appellant,

v.

DAHLILA GUERRA CASSO,                                          Appellee.

### On appeal from the 92nd District Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Memorandum Opinion by Justice Garza

A Hidalgo County jury found appellant, the City of McAllen (the "City"), liable for

breach of contract and fraud in a lawsuit filed by appellee, Dahlila Guerra Casso. The

City was ordered to pay over $440,000 in damages and $150,000 in attorney's fees,

and it was ordered to specifically perform its duties under the contract at issue. On appeal, the City contends by twelve issues that the trial court erred in rendering judgment on the jury's verdict. We will affirm the judgment as modified.

## I. Background

Casso was appointed by the City in 1990 to be the presiding judge of its municipal court. In 1991, she was diagnosed with systemic lupus erythematosus ("Lupus"), an autoimmune disorder with no known cure. Casso was reappointed as municipal judge several times, but decided to resign in 1999. At that time, she informed the City that she believed her health condition had been aggravated by unsanitary conditions at the building in which she worked. She indicated to City officials that she would be amenable to releasing whatever claims she had against the City in exchange for, among other things, continued health insurance coverage. Accordingly, Casso negotiated an agreement with the City in which she promised to release the City "from any type of claim, demand, and cause of action whatsoever arising out of her employment or that could have been brought by her, relating to her employment or her separation . . . ." The agreement further stated, in relevant part, as follows:

1. CONSIDERATION

In consideration for the promise made by Casso in this Agreement, the City agrees to the following payments and/or benefits referred herein as "Consideration": a lump sum payment equal to Fifty Thousand Dollars ($50,000.00) plus an amount equal to the City's total contributions to Casso's [Texas Municipal Retirement System] account as of the date of the execution of this Agreement. In addition, the City will continue to pay Casso's health insurance premiums for Health Insurance coverage with The City of McAllen throughout the period of time from the date of the execution of this Agreement through June 2002.

. . . .

2

5.  NATURE OF CONSIDERATION

Casso understands and acknowledges that the settlement payments hereunder are for the alleged mental anguish and physical sickness she has claimed, associated with the aggravation of her physical disability, Lupus.  Casso understands that the City denies the claims she has asserted.

. . . .

16.  ENTIRE AGREEMENT

This Agreement constitutes the entire agreement, covenant, and consideration between the parties.  There was no reliance upon any other representation, statement, consideration, covenant, promise, or agreement not contained in the Agreement for the covenant made in these documents.

17.  REPRESENTATIONS BY CASSO

In return for the Consideration, Casso represents the following to the City: (1) I am legally competent to execute this Agreement; (2) in making this settlement and with respect to the Agreement, I have had the benefit of advise [sic] of counsel chosen by me; (3) no promise or representation of any kind has been made to me by the City, or by anyone acting for the City, except as is expressly stated in the Agreement; . . . (7) I understand that the Agreement represents and contains the entire agreement between the parties hereto . . . .

Casso, acting on her own behalf and without independent legal counsel, executed the release agreement along with the City's attorney on April 12, 1999.

In accordance with the agreement, the City paid Casso $128,000,[1] and it paid her health insurance premiums until June 1, 2002.  At that time, Casso began making the monthly premium payments.  The City believed, however, that it was not obligated under the agreement to keep Casso enrolled indefinitely on its insurance plan, even if Casso continued to make the premium payments.  Instead, the City believed that Casso

---

[1] This sum included the $50,000 lump sum and $78,000 representing the City's contributions to Casso's retirement account.

3

would be eligible for 18 months of post-employment health insurance coverage through COBRA, beginning in June 2002.[2] In 2001, the City sent Casso a form entitled "Enrollment/Change/Cancellation Form" and it asked that Casso sign it. Casso testified:

> I was asked to come by the insurance department and talk to Becky and another young lady that were there. I was told that I needed to sign that form. And I was—I said, why. And I joked with them about never signing a form that was blank. But I was told that was so that they could enroll me on the new—I think they went from TML [Texas Municipal League] to TASB [Texas Association of School Boards] or—there had been a change in their third party—in their carrier or whatever they were called.[3] And it seemed innocent enough to me. And then I did read the portion where I signed and even that was an innocent—I joked with them. I said you want me to sign so they can take money from my payroll—from my paycheck but I wasn't getting a paycheck from the City. So it really—you know, if I was going to continue my insurance it didn't make a difference to me whether I signed that or not. It had—in my opinion it had no value. They were asking me to sign something just so they could continue to process my insurance and keep me current. And they had me sign something that says I authorize the City of McAllen to take money from my paycheck or to make a payroll deduction.

Casso signed the blank form on a signature line underneath the following statement: "I authorize my employer to make the appropriate payroll deductions as a result of this enrollment and/or change." The City then forwarded the form to TASB, its third-party claims administrator, along with a letter from Rebecca Ramirez, the City's benefits coordinator, explaining that Casso was enrolling in COBRA health insurance coverage. The letter, which was admitted into evidence at trial, claimed that Casso is "eligible for C[OBRA] benefits effective July 1, 2002 through December 31, 2003." The form, as

---

[2] "COBRA" refers to the Consolidated Omnibus Budget Reconciliation Act of 1985. *See* 42 U.S.C. §§ 300bb-1–300bb-8. Section 300bb-1(a) of COBRA applies to health insurance plans maintained by state and local governmental units. *Id.* § 300bb-1(a). It requires that such plans permit employees who lose coverage as a result of a "qualifying event," such as termination of employment, to elect to continue coverage for up to 18 months following the "qualifying event." *Id.*

[3] The evidence showed that the health insurance plan at issue was maintained by the City itself and that there was no separate insurance "carrier." The City did, however, use third-party administrators—including, at various times, TML and TASB—to process claims under the plan.

4

sent to TASB, had the words "Cobra Coverage" handwritten on a line next to the words "Qualifying Event." Casso stated that she did not intend for the form to be used to enroll her in COBRA, because she believed she was still entitled, under the agreement, to be covered by the City's insurance plan as long as she paid the premiums.[4]

Despite the fact that Casso continued to make the premium payments, the City terminated her health insurance coverage at the end of December 2003. Casso later sued the City, claiming that the City was obligated under the release agreement to keep her on its health insurance plan until she turned 65, at which point she would be eligible for Medicare. The trial court initially granted a plea to the jurisdiction in favor of the City, but we reversed. *Casso v. City of McAllen*, No. 13-08-00618-CV, 2009 Tex. App. LEXIS 2049, at *22–23 (Tex. App.—Corpus Christi 2009, pet. denied) (mem. op.) (holding that "the City was performing a proprietary function in providing Casso with health insurance coverage; therefore, the City is not entitled to governmental immunity").

At trial, Casso testified that, after the City terminated her coverage, she applied for health insurance through the State Bar of Texas but was denied. She also made several other unsuccessful attempts to obtain health insurance coverage. Casso stated

---

[4] Eventually, Casso learned that she was ineligible for COBRA coverage as of June 1, 2002, because more than 18 months had passed since the applicable "qualifying event"—i.e., the termination of her employment. *See id.* § 300bb-2(2)(A)(i) (stating that, where the "qualifying event" is termination of employment or reduced hours, the "maximum required period" of continued coverage is "the date which is 18 months after the date of the qualifying event"); § 300bb-3 (stating that a "qualifying event" means "any of the following events which, but for the continuation coverage required under this subchapter, would result in the loss of coverage of a qualified beneficiary: (1) The death of the covered employee[;] (2) The termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment[;] (3) The divorce or legal separation of the covered employee from the employee's spouse[;] (4) The covered employee becoming entitled to benefits under title XVIII of the Social Security Act[;] (5) A dependent child ceasing to be a dependent child under the generally applicable requirements of the plan."). The City's staff was mistaken in its belief that, under COBRA, the "qualifying event" was the termination of Casso's fully-paid health insurance coverage on June 1, 2002. *See id.* § 300bb-3.

that she has gone without health insurance coverage since December 2003. She identified evidence of several large medical bills she paid out-of-pocket since then.

Casso conceded on cross-examination that, if a City employee resigns, he or she would not ordinarily be entitled to continued health insurance coverage beyond access to COBRA. She also stated that she specifically negotiated certain terms of the settlement agreement. In particular, Casso demanded that the agreement state that she resigned her position and was not terminated; she demanded that the agreement state that the compensation was for "aggravation" of her Lupus condition; and she demanded that the agreement make no reference to her potential COBRA eligibility.

Casso agreed with the City's counsel that the City had complied with the release agreement's express requirements that it (1) pay her $50,000, (2) pay her an amount equal to the contributions made by the City to her retirement account, and (3) pay her health insurance premiums up until June 2002. Casso argued, however, that the agreement contained an additional implied term—namely, that the City was required to maintain her eligibility to buy into the health insurance plan until such time as she became eligible for Medicare—which the City violated by unilaterally terminating her coverage at the end of December 2003.

Casso's theory was that the agreement was ambiguous because, while it specified the date upon which the City would stop paying her insurance premiums, it did not specify the date upon which her ability to buy into the plan—that is, her ability to maintain enrollment in the plan while paying her own premiums—would be terminated. Casso urged that the ambiguity could be resolved by considering the circumstances surrounding the formation of the agreement; in particular, she noted that, at the time of

6

the agreement, the City was fully aware of her medical condition and her need for continuous health insurance coverage.

Casso also argued that the ambiguity could be resolved by referring to the City's 2003 "Employee Benefit Plan" (the "Plan"). The Plan, which was entered into evidence, defines four different categories of "participant": (1) a regular full-time employee; (2) a spouse or child of a participant; (3) a retired employee "who meets the requirements set forth in this Plan"[5]; or (4) a COBRA participant. Casso reasoned that, because she was no longer a full-time employee and because COBRA is legally available for only 18 months post-employment, she must have been covered as a "retiree" participant from 1999 until December 2003. She further claimed that, under the terms of the plan, a "retiree" is entitled to buy in to coverage until the time he or she turns 65 years old and becomes eligible for Medicare. She argued that the City breached the agreement by terminating her access to coverage prior to age 65.

The City contended that the agreement was unambiguous and it filed a motion in limine seeking to exclude, among other things, extraneous evidence regarding the terms of the agreement. The City also filed a motion to exclude any evidence of an oral agreement on parol evidence grounds. The trial court denied the motions, thereby implicitly concluding as a matter of law that the agreement was ambiguous. *See Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011)

---

[5] The Plan defines a retiree "participant" as "[a] person who is an Eligible SB 404 Retiree of the City who has: 1) 28 years of service, or 2) 25 years of service and age 50, or 3) 10 years of service and age 60." "Eligible SB 404 Retiree" apparently refers to Texas Local Government Code chapter 175, which was originally enacted as Senate Bill 404. *See* Act of June 15, 1993, 73rd Leg., R.S., ch. 663, § 1, 1993 TEX. SESS. LAW. SERV. 2462, 2463–64 (amended 1995, 2009) (current version at TEX. LOC. GOV'T CODE ANN. §§ 175.001–.007 (West Supp. 2011)). That chapter provides, among other things, that a person who retires from a municipality with a population of 25,000 or more and is "entitled to receive retirement benefits from a . . . municipal retirement plan" is entitled to purchase continued health insurance coverage from the municipality. *See* TEX. LOC. GOV'T CODE ANN. §§ 175.001–.002.

7

("Only where a contract is ambiguous may a court consider the parties' interpretation and 'admit extraneous evidence to determine the true meaning of the instrument.'") (quoting *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008) (per curiam)).

After trial, the jury found that the City agreed to treat Casso as a "retiree" under the City's health plan and that the City failed to comply with that agreement. The jury awarded damages as follows: $38,523.43 for medical costs incurred by Casso between January 1, 2004 and the time of trial; $150,000 for medical costs incurred on or after January 1, 2004 which the City's insurance plan would have paid; $126,000 in past net profits; and $126,000 in future net profits. The jury further found that the City committed fraud against Casso and awarded an additional $126,000 in damages representing future net profits.[6] Casso filed a "Motion to Sign Judgment" in accordance with the verdict. The trial court granted the motion and rendered final judgment awarding Casso $440,523.43 in actual damages, $8,705.20 in court costs, $150,000 in attorney's fees, and pre- and post-judgment interest.[7] The final judgment further stated:

> [T]his Court also enters judgment on the equitable remedy of specific performance and [the City] is hereby ordered to enroll [Casso] on its current health insurance plan as a "Retiree Participant" within three (3)

---

[6] A majority of the jury also found fraud by clear and convincing evidence and awarded Casso $300,000 in exemplary damages. However, that finding was not unanimous and so judgment was not rendered thereon. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(e) (West Supp. 2011).

Moreover, the $126,000 in future net profits awarded as fraud damages was not included in the final judgment, presumably because $126,000 in future net profits damages had already been awarded pursuant to the breach of contract finding. This is despite the fact that the jury was instructed in the damages questions as follows: "You shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any."

[7] Pre-judgment interest was awarded only on "$314,523.43 in past damages." This amount includes all of the damages awarded except those attributable to future net profits. Post-judgment interest was awarded on the entire amount of damages, plus all fees, costs, and pre-judgment interest awarded in the judgment, amounting to $659,460.38.

8

days of the date of this Judgment and [Casso] is ordered to pay monthly premiums of $245 beginning the first day of the month following the date of this Judgment. [Casso] shall remain on [the City]'s health insurance Plan as a "Retiree Participant" until the earlier of the following dates: (a) the date of [Casso]'s death; (b) the last day of the month in which [Casso] turns 65; or (c) the last day of the month in which [Casso] fails to pay the $245 monthly premium.

The City filed a motion for new trial as well as a motion to modify, correct, or reform the judgment, both of which were overruled by operation of law. *See* TEX. R. CIV. P. 329b(c). This appeal followed.

## II. DISCUSSION

### A. Breach of Contract Claim

By its first issue, the City contends that there was legally and factually insufficient evidence to support the jury's finding that it agreed to treat Casso as a "retiree" for purposes of her post-employment health insurance coverage. By its second issue, the City urges that there was legally and factually insufficient evidence to support the finding that the City breached its obligations under any such agreement.

#### 1. Standard of Review and Applicable Law

In evaluating the legal sufficiency of the evidence supporting a verdict, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We will sustain a legal sufficiency challenge only if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810. In reviewing

9

factual sufficiency, we consider all the evidence in a neutral light and will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Our primary concern when construing a written contract is to ascertain the true intentions of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *Heil Co. v. Polar Corp.*, 191 S.W.3d 805, 810 (Tex. App.—Fort Worth 2006, pet. denied). If the language of a contract can be given a certain and definite meaning, it is not ambiguous and the contract's construction is a matter for the court. *Milner v. Milner*, 361 S.W.3d 615, 619 (Tex. 2012) (citing *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex. 2009) (per curiam)). On the other hand, if the agreement is susceptible to more than one reasonable interpretation, the agreement is ambiguous, creating a fact issue on the parties' intent. *Id.* (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)). An unambiguous contract will be enforced as written, and parol evidence cannot be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports. *Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 451. "Only where a contract is ambiguous may a court consider the parties' interpretation and 'admit extraneous evidence to determine the true meaning of the instrument.'" *Id.* (quoting *Haden*, 266 S.W.3d at 450–51).

A trial court's determination of whether a contract is ambiguous is a question of law that we review de novo. *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 705 (Tex. 2008).

### 2. Analysis

10

The City argues that the agreement was unambiguous as a matter of law and that parol evidence was, therefore, inadmissible to establish its terms. It contends that, without such parol evidence, there was legally and factually insufficient evidentiary support for the jury's finding that the City breached its contract with Casso.

At trial, Casso advanced several arguments as to why the agreement was ambiguous. First, she contended that because the City agreed to pay her the entire amount it contributed to her retirement account, the City must therefore have intended to treat her as a "retiree."[8] She notes that a City employee ordinarily must accrue at least ten years of service before he or she is "vested" and eligible to receive the retirement contributions previously made by the City, *see* TEX. GOV'T CODE ANN. § 854.202 (West Supp. 2011), but that, at the time Casso resigned, she had accrued only nine years of service. Casso argued that the City's advancement to her of benefits ordinarily unavailable to non-retirees evinced an intent on the part of the City to treat her as a "retiree" for purposes of health insurance coverage.

---

[8] Casso's live petition alleged that, under the terms of the Plan, health insurance "coverage for retirees is not limited" in duration. In fact, the Plan does not explicitly state when a "retiree" participant loses his or her eligibility for coverage. The section of the Plan regarding "Participant Termination" states only as follows:

Participant Coverage shall automatically terminate upon the earliest of the following dates:

1. Last day of Calendar Month coincident or next following date of termination of employment of Participant. EXCEPT: This shall not apply to a person who qualifies as a Participant due to being an Eligible Retiree; or

2. Date the Participant ceases to be eligible for coverage; or

3. Date the Participant fails to pay the required contribution for coverage; or

4. Date the Plan is terminated; the date of termination of such benefit; or

5. Date the City terminates coverage for Participant; or

6. Date the Participant dies.

Second, Casso points to various items of evidence extraneous to the agreement, including: (1) the terms of 2003 Plan, which listed only four classes of participants: employee, dependent, retiree, and COBRA; (2) invoices for Casso's health insurance premiums between June 2002 and December 2003, which referred to Casso as a "retiree"; (3) correspondence between the City and Casso, in which the City referred to Casso's coverage as "retiree" status; and (4) testimony by Casso that the City agreed to treat her as a "retiree" for purposes of health insurance coverage. Casso alleged that, of the four types of participants defined in the Plan, the only possible category she could have fit in was "retiree," because the release agreement contemplated at least 38 months of coverage (i.e., from April 1999 to June 2002) and "[t]he only participants who may have post-employment health coverage over 18 months are retirees." She argued that the terms of the Plan therefore required the City to treat her as a "retiree" for purposes of health insurance eligibility.

Finally, Casso noted that both she and the City were fully aware of her chronic health condition at the time the release agreement was executed. She contended that both parties were also aware of the fact that, due to her condition, she would not be able to obtain other private health insurance coverage if her City health insurance coverage were to be terminated.

The City contends that evidence of Casso's health condition and of the terms of the Plan was inadmissible under the parol evidence rule. *See Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 451; *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 13 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("The parol evidence rule is not a mere rule of evidence, but a rule of substantive contract law. . . . Evidence violating the

12

parol evidence rule has no legal effect and merely constitutes proof of facts that are

immaterial and inoperative."). But the parol evidence rule

> does not prohibit consideration of surrounding circumstances that inform,
> rather than vary from or contradict, the contract text. Those
> circumstances include . . . the commercial or other setting in which the
> contract was negotiated and other objectively determinable factors that
> give a context to the transaction between the parties.

*Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462,

469 (Tex. 2011) (internal citations omitted).

Here, the release agreement at issue states that, in exchange for Casso's

release of her potential claims against the City, the City would: (1) make a $50,000

lump sum payment to Casso; (2) make a payment to Casso equaling the City's total

contributions to her retirement account; and (3) "continue to pay Casso's health

insurance premiums for Health Insurance coverage with The City of McAllen throughout

the period of time from the date of the execution of this Agreement through June 2002."

Because the City was obligated to pay Casso's premiums until June 2002, the City was

also implicitly obligated to preserve Casso's eligibility for health insurance coverage until

that date. However, the agreement does not address—either explicitly or implicitly—the

question of whether or when her eligibility for health insurance would be terminated. As

to health insurance eligibility post-June 2002, therefore, the agreement was susceptible

to two reasonable interpretations.[9] It was ambiguous as to that particular issue. *See*

*Milner*, 361 S.W.3d at 619. Accordingly, we disagree with the City that the agreement

was unambiguous as a matter of law.

We also disagree with the City that evidence of Casso's health condition and of

---

[9] It is noteworthy that the City preserved Casso's health insurance eligibility until December 2003, even though the City's position is that it was not obligated to preserve Casso's eligibility beyond June 2002.

13

the terms of the Plan was inadmissible. The Austin Court of Appeals also considered the question of ambiguity in an employment contract in *Carr v. Christie*, 970 S.W.2d 620 (Tex. App.—Austin 1998, pet. denied). In that case, the parties entered into an employment agreement which stated in part that "[t]he term of this agreement shall begin on the 1st day of August 1994 and shall continue for a period of one (1) year or until termination as hereinafter provided." *Id.* at 621. The contract also had a paragraph entitled "Involuntary Termination" which listed various specific circumstances under which the agreement "shall be deemed to be terminated and the employment relationship . . . shall be deemed severed . . . ." *Id.* The employee, Carr, was fired without cause after 18 months on the job, and he sued the employer, Christie, for breach of contract. *Id.* Christie argued that Carr's employment was at-will and that the circumstances listed in the "Involuntary Termination" paragraph were not intended to be exclusive. *Id.* at 622. Carr, on the other hand, argued that Christie breached the contract "because the parties intended the quoted language to mean that Carr shall be employed for a minimum of one year and thereafter might be discharged only for a reason specified in [the 'Involuntary Termination'] paragraph . . . ." *Id.* The trial court granted summary judgment in favor of Christie, but the court of appeals reversed, holding that the agreement was ambiguous because both Carr's and Christie's interpretations of the provisions at issue were reasonable. *Id.*

In determining that Carr's interpretation of the contract was reasonable, the court of appeals noted that "Carr's interpretation [is not] inconsistent with the circumstances under which the contract was written and executed." *Id.* The court rejected Christie's contention that consideration of the "circumstances under which the contract was

14

written" would run afoul of the parol evidence rule.  *Id.* at 622 n.2.  The court noted that:

> In interpreting contracts or clauses set forth in "clear and unambiguous" language, the courts do not confine themselves to a mere inspection of the document.  Before committing themselves, the courts carefully examine the surrounding circumstances, prior negotiations, and all other relevant incidents bearing on the intent of the parties . . . .
>
> Only after a careful and painstaking search of all the factors shedding light on the intent of the parties, only after "turning signs and symbols into equivalent realities" will the court conclude that the language in any given case is "clear and unambiguous."

*Id.* (quoting 4 WILLISTON ON CONTRACTS § 600A (3rd ed. 1957) (internal citations omitted)).

We find, consistent with *Carr*, that the parol evidence rule was not violated here. Casso's chronic health condition and the terms of the Plan constitute evidence of "objectively determinable factors that give a context to the transaction between the parties," which is admissible for purposes of determining if a contract is "clear and unambiguous."  *See Houston Exploration Co.*, 352 S.W.3d at 469; *Carr*, 970 S.W.2d at 622 n.2.  Considering that evidence, the trial court was justified in its implicit determination that the contract was susceptible to more than one reasonable interpretation.  And, a reasonable juror could have concluded from that evidence that the parties intended, by the 2003 settlement agreement, for Casso's health insurance eligibility to be preserved until such time as she obtained other health insurance or was eligible for Medicare.  *See City of Keller*, 168 S.W.3d 802 at 819 ("Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony.  They may choose to believe one witness and disbelieve another.  Reviewing courts cannot impose their own opinions to the contrary." (Internal citations omitted)).

The City further argues by its first issue that the trial court was prohibited by

15

statute from giving effect to any agreement to treat Casso as a "retiree" for purposes of health insurance. Specifically, the City argues that sections 172.002 and 172.004 of the Texas Local Government Code require that, if a political subdivision chooses to provide health insurance benefits to employees, those benefits must be uniform as to all employees. *See* TEX. LOC. GOV'T CODE ANN. § 172.002 (West 2008); *id.* § 172.004(a) (West 2008) ("A political subdivision . . . directly or through a risk pool may provide health and accident coverage for political subdivision officials, employees, and retirees or any class of officials, employees, or retirees, and employees of affiliated service contractors."). The City also contends that ERISA,[10] the federal statute governing employee benefit plans, prohibits the enforcement of any agreement to treat Casso as a "retiree." *See Greathouse v. Glidden Co.*, 40 S.W.3d 560, 567–68 (Tex. App.—Houston [14th Dist.] 2001, no pet.) ("The policy behind the 'written instrument' clause in ERISA is to prevent collusive or fraudulent side agreements between employers and employees. . . . Therefore, ERISA precludes all oral modifications and written modifications which do not purport to be formal amendments of a plan."); *see also* 29 U.S.C. § 1102(a)(1) ("Every employee benefit plan shall be established and maintained pursuant to a written instrument. . . ."). Again, we disagree. Nothing in the local government code or ERISA prohibits a political subdivision from entering into agreements in which continued access to health insurance coverage is granted in exchange for the release of disputed claims. ERISA does require that every plan be administered in accordance with its establishing instrument, *see* 29 U.S.C. § 1102(a)(1); however, there is also nothing in the terms of the written Plan at issue that precludes

---

[10] ERISA refers to the Employee Retirement and Income Security Act of 1974, which is codified in chapter 18 of title 29 of the United States Code. *See* 29 U.S.C. §§ 1001–1453.

16

enforcement of the release agreement. In fact, the Plan states explicitly that "[t]he City of McAllen shall have the authority, in its sole discretion, to make any and all factual determinations, Plan interpretations, eligibility and/or other determinations that it deems necessary . . . ." The Plan also provides that "the City reserves the right to amend, suspend or terminate the Plan, in whole or in part, at any time." The Plan therefore appears to permit the City to enter into agreements such as the one at issue here. We are not persuaded by the City's argument that the agreement is unenforceable under chapter 27 of the local government code and ERISA.

Finally, the City argues that any agreement to grant Casso health insurance eligibility was unenforceable due to the statute of frauds. *See* TEX. BUS. & COM. CODE ANN. § 26.01(a), (b)(6) (West 2009) (providing that "an agreement which is not to be performed within one year from the date of making the agreement" is not enforceable unless the "agreement, or a memorandum of it, is (1) in writing; and (2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him"). Assuming *arguendo* that the statute of frauds applies to the agreement at issue, we find that the release agreement, which was written and was duly signed by the City's attorney, satisfies the statute's requirements. The mere fact that the release agreement was ambiguous as to Casso's post-2002 health insurance eligibility does not negate the agreement's written character.

Considering the evidence in the light most favorable to the jury's verdict, *see City of Keller*, 168 S.W.3d at 822, we conclude that there was legally sufficient evidence supporting the jury's findings that (1) the City agreed to treat Casso as a health insurance "retiree" participant until the age of 65, and (2) the City breached that

17

agreement. Additionally, considering the evidence in a neutral light, we find that the evidence is factually sufficient to support those findings. The City's first and second issues are overruled.

**B.  Medical Costs Damages**

By its third issue, the City contends the evidence was legally and factually insufficient to support the award of medical cost damages corresponding to the breach of contract claim.

Question 3 of the jury charge asked what sum of money, if paid now in cash, would fairly and reasonably compensate Casso for damages resulting from the City's breach of contract. Subsection (a) of question 3 asked the jury to assess "[t]he medical costs, if any, paid or incurred by Dahlila Guerra Casso between January 1, 2004 and the present, less the sum that Casso would have paid in monthly premiums during that period to obtain coverage under the City of McAllen, Texas health insurance plan." The jury answered "$38,523.43." The City first contends by its third issue that there was insufficient evidence of the difference between the medical costs incurred by Casso and the sum she would have been required to pay for her health insurance coverage between January 1, 2004 and the time of trial. The City specifically claims that no attempt was made to show what the City's insurance premium amounts were for retiree participants between January 1, 2004 and the time of trial.

We find that the evidence was sufficient to support the jury's answer to charge question 3(a). Among the pieces of evidence before the jury were billing records from various medical providers that treated Casso during the relevant time period. Those bills reflected total medical costs of $58,306.19. The jury was also able to consider

18

several monthly invoices sent by the City between 2002 and 2003 asking Casso to pay a monthly premium of $215.03. The jury additionally heard testimony from City Manager Mike Perez that the current monthly premium for a retiree participant is $245. The jury could have chosen to disbelieve Perez and instead to believe that the 2002–2003 monthly invoices reflected the amount Casso would have been charged in monthly premiums between 2004 and 2011. *See id.* at 819. We therefore conclude that the jury could have reasonably found that Casso suffered $38,523.43 in damages, representing the difference between the amount she paid or incurred in medical costs and the amount she would have been required to pay in insurance premiums from January 1, 2004 to the time of trial.[11]

The City next argues by its third issue that the evidence was insufficient to establish damages under question 3(b) of the jury charge, which asked the jury to assess:

> The medical costs, if any, that in reasonable probability, would have been or will be incurred by Dahlila Guerra Casso on and after January 1, 2004 that would have been actually paid by the City of McAllen, Texas health insurance plan, less the sum that Casso would have paid in monthly premiums during that period to obtain coverage under the City of McAllen, Texas health insurance plan.[12]

---

[11] The amount could have been reasonably calculated as follows: $58,306.19 (Casso's incurred medical costs between 2004 and 2011) minus $19,782.76 ($215.03 per month for 92 months, between January 2004 and August 2011) equals $38,523.43.

[12] As noted, question 3(a) asked the jury to assess the medical costs incurred by Casso between January 1, 2004 and the time of trial; whereas question 3(b) asked the jury to assess the amount that "would have been" incurred or "will be incurred" by Casso "on and after January 1, 2004 that would have been actually paid" by the City's health insurance plan, less the amount Casso would have paid in premiums. Question 3(b) therefore arguably invited the jury to award duplicate damages for medical costs incurred by Casso between January 1, 2004 and the time of trial. However, as we noted *supra* at note 6, the jury was specifically instructed not to award duplicate damages. Moreover, at the charge conference, Casso's counsel set forth his theory as to why the questions did not create a risk of double recovery:

> Number one [question 3(a)] is the actual out of pocket medical costs that [Casso] paid on that charge of $58,000 that we showed the jury. The second one [question 3(b)] is the

19

The jury answered "$150,000.00." The City contends that the evidence was insufficient to establish that these medical costs "would have been or will be" incurred by Casso.

Casso's primary care physician, Michael Jelinek, M.D., testified that he has treated Casso for her Lupus condition since 1992. He stated that Lupus is an autoimmune disease without a known cure, so treatment consists primarily of managing a patient's symptoms. According to Dr. Jelinek, Casso's Lupus caused her to suffer severe joint pain, the inability to walk, hair loss, and various infections. He testified that he attempted to treat these symptoms by prescribing an immunomodulator, a medication that suppresses the immune system. Dr. Jelinek testified that immunomodulator therapy costs about $2,000 to $2,500 per infusion and that an infusion should be administered every three to four weeks. For Casso's treatment, Dr. Jelinek prescribed Remicade, an immunomodulator that is administered intravenously. Dr. Jelinek stated that Casso would need an infusion of Remicade—or, if Casso did not respond to that medication, another immunomodulator—every three to four weeks for the rest of her life.

The City notes that Casso suffered an adverse reaction to a Remicade infusion in July 2003 and that it was not certain that she would have been able to continue Remicade treatments beyond December 2003, when her health insurance eligibility was

---

measure of damages—the benefit of the bargain damages. The benefit of the bargain damages are damages that are recoverable in a breach of contract case. And that is what damages would put the Plaintiff in a position that the Plaintiff would have been [in] had the contract been performed. Had the contract been performed she would have received all of these Remicade treatments, for example, and the benefit of the bargain measure is what is set forth there. It's a description of these medical benefits that she would have received had the contract been performed.

Although the City objected at the charge conference on the basis that the submission of question 3(b) created a risk of double recovery, the City has not raised that issue on appeal.

terminated. The City also notes that Casso had not been prescribed Remicade until 2003 and was using less-expensive medication prior to that time.

We find the evidence sufficient to support the jury's answer to question 3(b). Although the City is correct in noting that Casso's pre-2003 treatments were not as expensive as the Remicade infusions, Dr. Jelinek testified that Casso's condition "deteriorated substantially since the expiry of her insurance coverage" and that "the progression of her illness could have been controlled or slowed down if proper care had been more forthcoming." The jury could have therefore reasonably concluded that Remicade or other immunomodulator treatment was necessary for Casso in the years beyond 2003, even if it was not necessary for her before that time. Moreover, in determining damages, the jury has discretion to award damages within the range of evidence presented at trial. *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002). As Casso notes, the evidence presented at trial could have supported an award of future medical damages exceeding $400,000, representing a $2,500 Remicade treatment minus a $215.03 monthly premium payment every month from 2004 until 2018, when Casso will become eligible for Medicare.[13] Of course, the evidence could have also supported a conclusion that Casso's future medical costs were zero because she had suffered an adverse reaction to Remicade, and Dr. Jelinek could not say for sure that post-2003 Remicade treatments would have been possible. But that is not what the jury found—and we cannot and will not substitute our judgment for that of the jury. Viewing the evidence in the light most favorable to the jury's verdict, *see City of Keller*, 168 S.W.3d at 822, we conclude that the evidence was legally sufficient to

---

[13] That amount could be calculated as follows: $450,000 (representing monthly $2,500 Remicade treatments over 180 months, from 2004 to 2018) minus $38,705.40 (representing monthly $215.03 premium payments over the same time period) equals $411,294.60.

21

support an award of $150,000 in medical cost damages under question 3(b). Viewing the evidence in a neutral light, *see Cain*, 709 S.W.2d at 176, we find the evidence factually sufficient.

The City additionally complains by its third issue that the trial court failed to submit its requested instruction on mitigation of damages. The mitigation of damages doctrine "prevents a party from recovering for damages resulting from a breach of contract that could be avoided by reasonable efforts on the part of the plaintiff." *Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995) (citing *Walker v. Salt Flat Water Co.*, 128 Tex. 140, 96 S.W.2d 231, 232 (1936) ("Where a party is entitled to the benefits of a contract and can save himself from the damages resulting from its breach at a trifling expense or with reasonable exertions, it is his duty to incur such expense and make such exertions.")). A defendant claiming failure to mitigate damages has the burden of proving lack of diligence on the part of the plaintiff, and the amount by which the damages were increased as a result of the failure to mitigate. *Cocke v. White*, 697 S.W.2d 739, 744 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.).

We find no error in the trial court's refusal to submit a mitigation instruction. Casso testified that, after learning that the City would terminate her health insurance eligibility, she sought alternative health insurance coverage through the State Bar of Texas but was denied. She also testified that she consulted with her insurance agent as to the availability of private health insurance. According to Casso, her agent replied "don't bother. . . . I don't know of anybody that's going to insure you." The City points to testimony by Casso in which she appeared to acknowledge that she might qualify for

22

certain insurance coverage available on the internet, despite her pre-existing condition.[14] However, the City was under a burden to produce evidence that Casso failed to show diligence in pursuing alternative health insurance. *See id.* The City failed in that regard. Accordingly, the trial court did not err in refusing to instruct the jury on mitigation of damages.

The City's third issue is overruled.

## C.    Lost Profits Damages

By its fourth issue, the City argues that the evidence was insufficient to support the award of lost profits damages pursuant to Casso's breach of contract claim.[15]

The City first argues that lost attorney's fees are not recoverable as a matter of law because they are not a foreseeable consequence of the breach of an unrelated contract. The City cites *Stuart v. Bayless*, where the Texas Supreme Court held that an

---

[14] The City's counsel asked Casso: "Isn't it true . . . that you've become aware of an insurance policy for which you can qualify?" Casso replied: "Am I aware that I can qualify? No. Some [insurance policies] have been mentioned. And I found it very offensive that it was suggested by your client . . . that I go out and secure some insurance off the internet so that the City doesn't have to provide and keep their obligation. . . ." Casso continued:

> If that's part of the national health care [act] that may be overturned next week or the week after—if that's what you're referring to that one court finds unconstitutional and the other upholds, I am not going to take care of—going to do the research because the City has failed me and has breached the contract.

The parties are apparently referring to the federal Patient Protection and Affordable Care Act ("PPACA"), which includes a "guaranteed issue" requirement barring insurers from denying coverage to any person due to that person's medical condition or history. *See* 42 U.S.C. §§ 300gg-1, 300gg-3, 300gg-4(a). Although the United States Supreme Court has since upheld the portion of the PPACA containing this requirement, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2613 (U.S. 2012), we cannot fault Casso's confusion as to the status of the law at the time of trial.

[15] Question 3(c) of the jury charge asked the jury to assess "[t]he net profits, if any, that Dahlila Guerra Casso, in reasonable probability would have earned from January 2004 to the present had she not lost the health benefits associated with having health insurance with the City of McAllen, Texas." The jury answered "$126,000.00."

Question 3(d) asked the jury to assess "[t]he net profits, if any, that [Casso], in reasonable probability would have earned in the future had she not lost the health benefits associated with having health insurance with the City of McAllen, Texas." The jury answered "$126,000.00."

attorney plaintiff, who had sued a former client for failure to pay fees, could not recover consequential damages for the loss of potential contingency fees in other unrelated cases. 964 S.W.2d 920, 921–22 (Tex. 1998) (per curiam). The plaintiff argued that, as long as his firm is able to collect an hourly-rate fee from clients, it can financially afford to take on contingent fee cases, but that the defendant's failure to pay resulted in the firm's inability to take on other contingent fee matters. *Id.* at 921. The Court rejected that argument, noting that the loss of unrelated contingency fees was not reasonably foreseeable. *Id.* (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997)) (stating that consequential damages are those that "result naturally, but not necessarily, from the defendant's wrongful acts"). We find that *Stuart* does not categorically preclude the recovery of attorney's fees as lost profits; it only precludes the recovery of such fees when their loss was not reasonably foreseeable. The defendant in *Stuart* could not have reasonably foreseen that her failure to pay the hourly-rate fee would have caused the plaintiff's law firm to refuse other, unrelated contingency-fee cases. *See id.* Here, in contrast, the City could have reasonably foreseen that terminating Casso's health insurance eligibility would have had a deleterious effect on her earnings. The recovery of attorney's fees as lost profits was therefore not barred as a matter of law.

The City next contends by its fourth issue that the evidence adduced at trial was insufficient to establish (1) a causal nexus between Casso's loss of health insurance coverage and her lost profits, or (2) the amount of such lost profits. In order to recover lost profits, a party must produce sufficient competent evidence to enable the fact finder to determine the net amount of the loss with reasonable certainty. *Holt Atherton Indus.,*

24

*Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992); *D/FW Commercial Roofing Co. v. Mehra*, 854 S.W.2d 182, 187 (Tex. App.—Dallas 1993, no writ). The evidence relative to the profits must not be uncertain or speculative. *Mehra*, 854 S.W.2d at 187 (citing *Sw. Battery Corp. v. Owen*, 131 Tex. 423, 426, 115 S.W.2d 1097, 1098 (1938)). However, it is not necessary that the lost profits be subject to exact calculation. *Holt Atherton*, 835 S.W.2d at 84.

> What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. Although supporting documentation may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates.

*ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010) (citations omitted). Courts have held that a party seeking lost profits damages must show either a history of profitability or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty. *Allied Bank W. Loop, N.A. v. C.B.D. & Assocs., Inc.*, 728 S.W.2d 49, 54–55 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (citing *Sw. Battery Corp.*, 131 Tex. at 423, 115 S.W.2d at 1097).

To support her claim for lost profits damages, Casso introduced evidence of profits from her law practice during the time she was insured, and evidence of her profits during the time she was uninsured. When she left the City's employment in 1999, Casso's annual salary was $70,000. Casso's 2002 federal income tax return shows that she earned $71,938 in business income in that year, during which she was still covered by the City's health insurance. Other income tax returns showed: a loss of $2,530 in 2004; a profit of $30,991 in 2005; a profit of $18,149 in 2006; a profit of $6,904 in 2007; a loss of $8,343 in 2008; and a profit of $9,569 in 2009. Thus, Casso

25

earned an average annual profit of $9,123.33 during the years 2004 to 2009, during which she did not have health insurance. The jury awarded $126,000 in past lost profits, corresponding to years 2004 through 2011, and $126,000 in future profits, corresponding to years 2012 through 2018, when Casso will become eligible for Medicare.

The City urges that Casso's evidence was insufficient because the only evidence as to a "history of profitability" during the time she was covered by health insurance but not employed by the City was her 2002 income tax return. *See id.* We disagree. Casso also introduced evidence that she earned $70,000 in her final year of employment as the City's municipal judge. This evidence, along with the income tax returns, constituted "facts, figures, or data from which the amount of lost profits can be ascertained." *See ERI Consulting Eng'rs*, 318 S.W.3d at 876. Moreover, the particular amount awarded by the jury was supported by the evidence. As noted, the evidence showed that Casso earned an average annual profit of $9,123.33 between 2004 and 2009, but that she earned an average of $70,969 in the years 1999 and 2002. The jury could therefore have reasonably concluded that Casso suffered as much as $61,845.67[16] in annual lost profits as a result of the City's breach. That annual amount would result in damages of $494,765.36[17] for years 2004 to 2011 and $432,919.69[18] for years 2012 to 2018. The jury's award of $126,000 for each of those respective time periods therefore did not exceed the amounts supported by the evidence. We further

---

[16] $70,969 minus $9,123.33.

[17] $61,845.67 per year for eight years.

[18] $61,845.67 per year for seven years.

26

find that the evidence—including Dr. Jelinek's testimony that Casso's condition deteriorated substantially after she lost health insurance—was legally and factually sufficient to support the jury's implicit conclusion that Casso's lost profits resulted from the City's termination of her health insurance eligibility.

The City's fourth issue is overruled.

**D.    Attorney's Fees Award**

By its fifth issue, the City argues that the award of $150,000 attorney's fees to Casso was erroneous because such fees were not recoverable from the City as a matter of law.

The award of attorney's fees in this case was based on section 38.001 of the civil practice and remedies code, which provides that a "person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2008). The question presented here is whether the City is an "individual or corporation" for purposes of the statute. In 1986, the Texas Supreme Court held that the predecessor statute to section 38.001 permitted the recovery of attorney's fees against a municipality where those fees were incurred in the context of enforcing a contract made by the municipality in its proprietary capacity. *See Gates v. City of Dallas*, 704 S.W.2d 737, 738–41 (Tex. 1986) (noting that the defendant city "is a home rule municipal corporation" and that, when the city entered into the underlying contract with plaintiff, it "acted in its proprietary role and was clothed with the same authority and subject to the same liabilities as a private citizen").

Apparently in response to that ruling, the Legislature enacted what is now section

5.904 of the local government code, which states: "A municipality may not be considered a corporation under a state statute governing corporations unless the statute extends its application to a municipality by express use of the term 'municipal corporation,' 'municipality,' 'city,' 'town,' or 'village.'" TEX. LOC. GOV'T CODE ANN. § 5.904(a) (West 2008); *see id.* § 5.904(b) ("It is the intent of the legislature that the limitation provided by this section apply regardless of whether the municipality is acting in a governmental or proprietary function."). This statute effectively amends section 38.001 so that it no longer authorizes the award of attorney's fees against a municipality. *See, e.g., City of Corinth v. NuRock Dev. Inc.*, 293 S.W.3d 360, 370 (Tex. App.—Fort Worth 2009, no pet.) (noting that the language of section 38.001 "indicates a clear legislative intent to exclude government entities from those against whom attorney's fees may be recovered under the statute"); *City of Alton v. Sharyland Water Supply Corp.*, 277 S.W.3d 132, 147 (Tex. App.—Corpus Christi 2009) ("[A] municipality . . . is not considered a corporation even when it is acting in its proprietary function."), *aff'd in part and rev'd in part on other grounds*, *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407 (Tex. 2011); *City of Dallas v. Arnett*, 762 S.W.2d 942, 951 (Tex. App.—Dallas 1988, writ denied).

Casso argues that the City did not preserve this issue for review because its only objection to the attorney's fees question in the jury charge was based on chapter 271 of the local government code. *See* TEX. R. APP. P. 33.1(a); *Exxon Corp. v. Allsup*, 808 S.W.2d 648, 655 (Tex. App.—Corpus Christi 1991, writ denied) ("An objection at trial which is not the same as the objection urged on appeal presents nothing for appellate review."); *see also* TEX. LOC. GOV'T CODE ANN. ch. 271 (West 2005 & Supp. 2011)

28

(waiving governmental immunity for certain contract claims). However, prior to rendition of the final judgment, the City filed a supplemental response to Casso's "Motion to Sign Judgment" in which it urged that "counties and cities are not individuals or corporations and, as such, a party may not recover attorney's fees against them under the statute." The City cited the relevant statutory and case law in advancing that argument. It also made this argument in its "Motion to Modify, Correct or Reform Judgment" filed after the final judgment was rendered.

We conclude that the issue has been preserved, *see* TEX. R. APP. P. 33.1(a), and that it is meritorious. We therefore sustain the City's fifth issue and modify the judgment to delete the attorney's fees award.

## E. Pre-Judgment Interest

By its sixth issue, the City argues that the award of pre-judgment interest on the award of medical cost damages pursuant to jury charge question 3(b) was impermissible because the award was attributable in part to future medical costs. *See* TEX. FIN. CODE ANN. § 304.1045 ("Prejudgment interest may not be assessed or recovered on an award of future damages.").

In response, Casso argues that the issue has not been preserved because the City did not object to question 3(b) on the basis that two questions—one addressing past medical costs and one addressing future medical costs—should instead be submitted. Casso further contends that the issue lacks merit because the jury's award of $150,000 in medical cost damages in response to question 3(b) could have been entirely attributable, under the evidence, to pre-trial medical costs.

29

We disagree that the issue has not been preserved. Texas Rule of Civil Procedure 274 states: "A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." TEX. R. CIV. P. 274. At the charge conference, the City objected to the submission of question 3(b) on the basis that it permitted double recovery of medical cost damages incurred by Casso between January 1, 2004 and the date of trial. The City's counsel argued: "I think what the Court needs to say is that the first one [question 3(a)] is medical costs paid or incurred between January 2004 and the present. And the second one [question 3(b)] should say the medical costs that will be incurred in reasonable probability from today forward . . . ."

In any event, the City is not, strictly speaking, challenging any element of the jury charge by its sixth issue. It does not claim that question 3(b) should have been bifurcated, and it does not claim that future damages should not have been submitted or awarded. Instead, the City is merely claiming that the trial court should not have awarded pre-judgment interest on an award of medical cost damages that encompassed both past and future costs. Therefore, the more stringent preservation requirements found in Rule 274 do not apply. Instead, to preserve the pre-judgment interest issue, the City was required only to make a timely complaint to the trial court that comports with its complaint on appeal. TEX. R. APP. P. 33.1(a); *Exxon Corp.*, 808 S.W.2d at 655. And, the City specifically objected to the award of pre-judgment interest—on the same basis as it now raises on appeal—in its post-trial "Motion to

30

Correct, Modify or Reform Judgment."  Accordingly, the issue has been preserved for our review.

We further agree with the City that the trial court erred in awarding pre-judgment interest on the amount awarded by the jury in response to charge question 3(b), because past and future damages were not segregated.  In *Cavnar v. Quality Control Parking, Inc.*, the Texas Supreme Court held that, because certain plaintiffs were awarded damages for both their past and their future losses in lump sums and past losses were not segregated from future losses, those plaintiffs were not entitled to recover pre-judgment interest on those elements of damages.  696 S.W.2d 549, 556 (Tex. 1985).[19]  The same result holds here.  Because past and future damages were submitted to the jury but were not segregated in the damages question at issue, Casso is not entitled to pre-judgment interest on the amount awarded pursuant to that question.  *See id.*; *KMG Kanal-Muller-Gruppe Deutschland GmbH & Co. KG v. Davis*, 175 S.W.3d 379, 396–97 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *Casteel v. Crown Life Ins. Co.*, 3 S.W.3d 582, 596 (Tex. App.—Austin 1997), *rev'd in part on other grounds*, 22 S.W.3d 378, 391 (Tex. 2000).

---

[19] *Cavnar* has been superseded by statute in wrongful death, personal injury, and property damage cases. *KMG Kanal-Muller-Gruppe Deutschland GmbH & Co. KG v. Davis*, 175 S.W.3d 379, 397 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *see* TEX. FIN. CODE ANN. § 304.101 (West 2006). Additionally, the Texas Supreme Court modified the common law pre-judgment interest rules set forth in *Cavnar* to conform with the statute governing pre-judgment interest in wrongful death, personal injury, and property damage cases. *See Johnson & Higgins of Tex. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998). However, where damages are awarded for economic injury rather than for personal injury, *Cavnar* still controls. *Davis*, 175 S.W.3d at 397. Moreover, the modifications made in *Johnson & Higgins* do not affect the viability of *Cavnar* with regard to award of pre-judgment interest on damages awards that are not segregated between past and future damages.

31

We sustain the City's sixth issue and modify the judgment to delete the award of pre-judgment interest on the $150,000 awarded as damages under jury charge question 3(b).

## F.    Specific Performance

By its seventh issue, the City argues that the trial court erred in commanding the City to specifically perform the contract at issue by enrolling Casso on its health insurance plan.   The City urges that this remedy violated the one-satisfaction rule. Again, we agree.   Specific performance is an equitable remedy that may be awarded upon a showing of breach of contract.  *Stafford v. S. Vanity Magazine, Inc.*, 231 S.W.3d 530, 535 (Tex. App.—Dallas 2007, pet. denied).   Specific performance is used as a substitute for monetary damages when such damages would not be adequate.  *Id.*  The one-satisfaction rule provides that a plaintiff is entitled to only one recovery for any damages suffered.  *See Casteel*, 22 S.W.3d at 390; *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991).   The related doctrine of election of remedies bars a plaintiff from recovering both damages for breach of a contract and specific performance of the contract.  *See NRG Exploration v. Rauch*, 905 S.W.2d 405, 410 (Tex. App.—Austin 1995, writ denied); *Seegers v. Spradley*, 522 S.W.2d 951, 957 (Tex. Civ. App.—Beaumont 1975, writ ref'd n.r.e.); *Redding v. Ferguson*, 501 S.W.2d 717, 720 (Tex. Civ. App.—Fort Worth 1973, writ ref'd n.r.e.) (concluding that when party obtains final judgment for damages, party can no longer demand specific performance of contract).

Here, the final judgment awarded a total of $440,523.43 in actual damages.  That sum included $150,000 awarded pursuant to the jury's answer to charge question 3(b),

32

which asked the jury to assess all "medical costs . . . that in reasonable probability . . . will be incurred by [Casso] on and after January 1, 2004 that would have been actually paid by the [City's] health insurance plan," less the amount that Casso would expend in premium payments. The provision of the final judgment commanding the City to enroll Casso on its health insurance plan remedies exactly the same damages—i.e., coverage of Casso's medical costs, minus her premium payments, through 2018. The award of specific performance was therefore in violation of the one-satisfaction rule.[20] We sustain the City's seventh issue and modify the judgment to delete the award of specific performance.

## G.    Fraud Claim

By its final five issues, the City argues that the trial court erred in rendering judgment on the jury's fraud verdict.[21] Specifically, the City contends by its eighth issue that that there was insufficient evidence to support the finding that the City committed fraud; by its ninth issue that the trial court erred by considering the jury's finding that Casso was entitled to past lost profits as a result of the fraud; by its tenth issue that the

---

[20] The City also claims by its seventh issue that specific performance was unavailable to Casso because she did not establish: (1) that she was ready, willing, and able to perform her obligations under the contract; or (2) that her remedy at law was inadequate. *See DiGiuseppe v. Lawler*, 269 S.W.3d 588, 593 (Tex. 2008) ("An essential element in obtaining the equitable remedy of specific performance is that the party seeking such relief must plead and prove he was ready, willing, and able to timely perform his obligations under the contract."); *City of Alton v. Sharyland Water Supply Corp.*, 277 S.W.3d 132, 147 (Tex. App.—Corpus Christi 2009) ("It is a fundamental rule of equity that a court will not grant specific performance unless it is shown that an adequate remedy does not exist at law."), *aff'd in part and rev'd in part on other grounds*, *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407 (Tex. 2011). We need not address these sub-issues because of our conclusion that the award of specific performance violated the one-satisfaction rule. *See* TEX. R. APP. P. 47.1.

[21] We note that there appears to be some confusion as to what alleged fraud Casso attempted to prove at trial. Casso's live petition characterized her fraud claim as one for fraudulent inducement; she alleged that she was induced into signing the agreement because "[t]he City represented to Casso that its original COBRA proposal would not be part of the agreement after Casso expressly rejected that proposal." On the other hand, on appeal, both parties confine their arguments regarding the fraud claim to the facts surrounding Casso's execution of the blank "Enrollment/Change/Cancellation Form" at the City's request in 2001. We need not resolve the confusion because of our conclusion herein that any error corresponding to the fraud judgment would not be reversible. *See* TEX. R. APP. P. 44.1(a), 47.1.

33

evidence of fraud was not clear and convincing; by its eleventh issue that there was insufficient evidence supporting the award of exemplary damages[22]; and by its twelfth issue that the fraud claim was barred by limitations.

We need not address these issues because the only damages actually awarded pursuant to the fraud verdict were past lost profit damages of $126,000, and this award, as we have concluded, was also justified by the breach of contract finding. Accordingly, even if we were to find error with respect to each of the City's five issues regarding the fraud verdict, those errors would not be reversible. *See* TEX. R. APP. P. 44.1(a) (stating that, in a civil case, "[n]o judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of: (1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals"); TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."). The City's eighth, ninth, tenth, eleventh, and twelfth issues are overruled.

## III. CONCLUSION

The judgment of the trial court is affirmed as modified herein. *See* TEX. R. APP. P. 43.2(b).

DORI CONTRERAS GARZA,
Justice

Delivered and filed the
28th day of March, 2013.

---

[22] As noted *supra* note 6, the final judgment did not contain an award of exemplary damages.